## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ENTERPRISE NATIONAL BANK,                )
                                         )
    3980 RCA Blvd., Suite 8012            )
    Palm Beach Gardens, FL 33410          )
                                         )
    Plaintiff,                            )          CIVIL ACTION NO. _____
                                         )
v.                                       )
                                         )
MIKE JOHANNS, SECRETARY,                 )
UNITED STATES DEPARTMENT OF              )
AGRICULTURE,                             )
                                         )
    1400 Independence Ave., S.W.          )
    Washington, DC 20250                  )
                                         )
    Defendant.                            )

## COMPLAINT FOR JUDICIAL ENFORCEMENT COMPELLING AGENCY ACTION UNLAWFULLY WITHHELD, DECLARATORY JUDGMENT, AND OTHER RELIEF

Enterprise National Bank (the "Bank") hereby files its Complaint for Judicial Enforcement Compelling Agency Action Unlawfully Withheld, Declaratory Judgment, and Other Relief showing this Court as follows:

### PARTIES

1.      Plaintiff, Enterprise National Bank of Palm Beach, Florida, is a national banking association chartered under the laws of the United States, with its principal place of business located in Palm Beach Gardens, Florida.

2.      Defendant, Mike Johanns, is the Secretary of the United States Department of Agriculture and is the federal official responsible for the administration of the statutes,

regulations, and programs at issue in this action.  Mr. Johanns is being sued in his representative

capacity.

## JURISDICTION

3.      Jurisdiction is founded upon 7 U.S.C. § 6999, 28 U.S.C. § 1331, 28 U.S.C.

§ 2201, and 5 U.S.C. §§ 703 and 706.  Plaintiff has exhausted all administrative remedies prior to

filing this action.  See 7 U.S.C. § 6912(e).

## VENUE

4.      Venue is proper under 28 U.S.C. § 1391(e) because the Defendant, the United

States Department of Agriculture through Mike Johanns as Secretary, resides in this judicial

district.

## GOVERNMENT PROGRAMS AT ISSUE

5.      The U.S. Department of Agriculture's Rural Development Division (the

"Agency") operates the Business and Industry ("B&I") guaranteed loan program.  See 7 C.F.R.

§§ 4279 and 4287 et seq.

6.      The B&I loan program's primary purpose is to help create and maintain jobs and

stimulate rural economies by providing financial backing for rural businesses.  The program is

designed to provide guarantees of up to 90 percent of a loan made by a commercial lender.

These guarantees are backed by the full faith and credit of the U.S. Government.

7.      Under the B&I program, loan proceeds may be used for working capital,

machinery and equipment, buildings and real estate, and certain types of debt refinancing.  B&I

loan guarantees can be extended to loans made by recognized commercial or other authorized

lenders in rural areas, including all areas other than cities of more than 50,000 people and the contiguous and urbanized area of such cities or towns.

8.      The Agency's regulations make B&I program guarantees incontestable except for fraud or misrepresentation of which a lender or holder participates in or condones, or negligent servicing having a material bearing on the loan as a whole. See 7 C.F.R. § 4279.72(a).[1]

9.      Decisions by the Agency to reduce, deny, or dishonor B&I program guarantees are appealable to the U.S. Department of Agriculture's National Appeals Division ("NAD"), pursuant to 7 U.S.C. § 6996 and 7 C.F.R. § 11.3.

10.     Final determinations by the NAD are enforceable by the U.S. District Courts pursuant to 7 U.S.C. § 6999: "A final determination of the Division shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5." See also 7 C.F.R. § 11.13.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      The Agency refuses to comply with a final determination of its National Appeals Division

11.     This case arises from the Agency's refusal to honor its complete B&I loan guarantee to the Bank following a December 2, 2005 final decision on the merits (the "Remand

---

[1] 7 C.F.R. § 4279.72(a): *Full faith and credit.* A guarantee under this part constitutes an obligation supported by the full faith and credit of the United States and is incontestable except for fraud or misrepresentation of which a lender or holder has actual knowledge at the time it becomes such lender or holder or which a lender or holder participates in or condones. The guarantee will be unenforceable to the extent that any loss is occasioned by a provision for interest on interest. In addition, the guarantee will be unenforceable by the lender to the extent any loss is occasioned by the violation of usury laws, negligent servicing, or failure to obtain the required security regardless of the time at which the Agency acquires knowledge thereof. Any losses occasioned will be unenforceable to the extent that loan funds are used for purposes other than those specifically approved by the Agency in its Conditional Commitment.

Determination") issued by a Hearing Officer of the NAD.[2]  The Hearing Officer found for the Bank, and against the Agency, while holding that the Bank had met its burden of proof in showing that the Agency's action in dishonoring the guarantee was erroneous.  The effect of the Hearing Officer's Remand Determination was to prohibit the Agency from dishonoring the loan guarantee in any form.

12.    According to Agency counsel Mark Stevens, the Agency received its copy of the Remand Determination on December 5, 2005.

13.    Pursuant to 7 U.S.C. § 6998(a)(2) and 7 C.F.R. § 11.9(a)(2), the Agency's deadline for requesting a review by the NAD Director expired 15 business days after the Agency received the Remand Determination, or on December 27, 2005.

14.    The Agency choose not to appeal the Remand Determination to the Director of the NAD for review and no appeal was docketed.

15.    Pursuant to 7 U.S.C. § 6997, the Hearing Officer's Remand Determination became a final determination of the NAD when it was not appealed to the NAD Director.  7 U.S.C. § 6997(d) states in pertinent part: "If the [Hearing Officer's] determination is not appealed to the Director for review under section 6998 of this title, the notice provided by the hearing officer shall be considered to be a notice of an administratively final determination."  See also 7 C.F.R. § 11.8(f).

---

[2] As explained in detail below, the Bank has participated in two NAD hearings before different Hearing Officers during the pendency of its appeal.  The first hearing took place during June and August 2004 before Hearing Officer Carlos Rodriguez in Palm Beach, Florida.  Following an appeal of Mr. Rodriguez's decision to the NAD Director, and a remand from the Deputy Director requiring a new hearing, the Bank participated in a second evidentiary hearing before Hearing Officer Charles Mills in Marietta, Georgia in May 2005.  Hearing Officer Mills' Remand Determination is the NAD ruling at issue before this Court.

16.    By not appealing the Remand Determination to the NAD Director, the Agency choose not to exhaust its administrative remedies before the NAD and therefore the Remand Determination is final and enforceable.

17.    As a final determination of the NAD, the Remand Determination is enforceable by this Court pursuant to 7 U.S.C. § 6999.

18.    The Remand Determination's operative "Determination" section states:

Under 7 C.F.R. § 11.8(e), Appellant has the burden of proving the adverse decision is erroneous by a preponderance of the evidence.  Appellant has proven that RBS's [the Agency's] decision is erroneous.

(emphasis added).

19.    The NAD's Hearing Officer Manual makes clear that the "Determination" section of the Hearing Officer's ruling is the operative portion of the ruling to be acted upon by the Agency and the Courts.  In distinguishing the "appeal determination" section from other sections appearing in Hearing Officer rulings, the NAD's manual states, "The appeal determination is limited to whether the agency erred or did not err in the adverse decision."

20.    After receiving the Hearing Officer's Remand Determination, undersigned counsel for the Bank contacted Agency counsel Mark Stevens on January 12, 2006 to discuss the Bank's renewed claim for payment under the guarantee.  Mr. Stevens, speaking on behalf of the Agency, represented that both the state and national Agency offices were processing the Bank's loss claim for payment in full plus accrued interest.  Undersigned counsel's letter to Mr. Stevens

of January 12, 2006 (a true and correct copy of which is attached hereto as Exhibit A)[3],

memorializes the conversation. Neither Mr. Stevens nor any other Agency official ever

contradicted or responded to the letter.

21.　　As instructed by the Agency, the Bank submitted a revised request for payment

under the B&I guarantee on February 3, 2006.

22.　　The Bank revised its request because it had recently completed the sale of all

remaining collateral. With the Hearing Officer's Remand Determination finding for the Bank,

and with the sale of loan collateral completed, final and full payment on the guarantee was

appropriate under the B&I program regulations. See 7 C.F.R. § 4287.158.

23.　　Based upon the ruling announced in the Hearing Officer's Remand

Determination, and the assurances of Agency counsel Mark Stevens that the Bank's loss claim

would be processed for payment in full with accrued interest, the Bank expected the Agency to

honor its guarantee in full.

24.　　On March 3, 2006, the Agency announced its decision to further dishonor its

guarantee by refusing payment of the Bank's claim to $3,030,000 in guaranteed funds plus

accrued interest while incorrectly relying upon the Hearing Officer's Remand Determination. A

true and correct copy of the Agency's March 3, 2006 letter is attached hereto as Exhibit B. The

Hearing Officer's Remand Determination does not provide for the split decision that the Agency

asserts as its interpretation of what the Hearing Officer meant. If the Hearing Officer had

---

[3] Undersigned counsel is aware of Local Rule 5.1(g) and states that Exhibits A and B attached hereto are essential to
the determination of this action. They are attached here because they were created following the closure of the NAD
case record and are not expected be to contained in that record when it is transmitted to this Court by the Defendant
Agency.

intended to issue a split decision, he would have done so by saying as much explicitly in the operative "Determination" section of the decision.

25.     Rather than fulfilling its statutory and regulatory mandate to comply with final decisions issued by the NAD, the Agency has relied upon dicta in the Hearing Officer's Remand Determination to reject the Bank's claim for payment of more than $3 million under the guarantee.  The $3,030,000 in guaranteed funds was specifically at issue in the NAD proceedings and Remand Determination and the Agency did not offer any additional explanation for its refusal to process the Bank's claim.  By rejecting the Bank's claim after electing not to appeal the result of the Hearing Officer's Remand Determination, the Agency is attempting to improperly shield its action from review and is ignoring the operative portion of the Remand Determination itself.

26.     Although the Bank attempted to negotiate with the Agency at both the state and national levels to resolve the situation amicably, the Agency rejected every request to discuss the matter.

27.     The Bank is left with no choice but to pursue this suit to enforce the NAD Hearing Officer's Remand Determination and to seek an Order compelling the Agency to comply with the Remand Determination by processing the remainder of the Bank's $3,030,000 loss claim for payment in full plus accrued interest without delay.

28.     The Agency's refusal to abide by the Hearing Officer's Remand Determination is but the latest act in a pattern of bad faith exhibited by the Agency and its representatives throughout the entire administrative proceeding below and dating back to the Agency's earliest interactions with the Bank concerning the underlying loan.

7

II.     **The Agency has acted in bad faith since its first introduction to the Catfish INT, Inc., loan and has repeatedly violated the Bank's due process rights**

29.     By withholding materially relevant information from the Bank during the loan origination process, the Agency violated in own regulations and policies and acted in bad faith even prior to loan closing.

30.     On June 19, 1999, the Bank closed a $5 million loan to Catfish INT, Inc. ("Catfish") for the development of a catfish processing and distribution facility in Wrightsville, Georgia. As envisioned, the facility would process live catfish into frozen and packaged fish filets for distribution.

31.     The Agency's Georgia state office issued a B&I program guarantee for 75% of the loan on October 1, 1999.

32.     Catfish subsequently defaulted, and Catfish's principal, Erwin David Rabhan, was later sentenced to a significant federal prison term for, among other things, committing fraud upon the Bank and the Agency in connection with this loan.[4]

33.     On October 20, 2003, the Agency's Georgia state office issued an adverse Agency determination letter alleging, among other things, that the Bank was deficient "in the processing and prudent monitoring of this loan," did not "comply with several covenants of the Lender's Agreement, Loan Agreement and Conditional Commitment for Guaranty," and was negligent in

---

[4] As revealed by the federal prosecution, the fraud perpetrated against the Bank was a complex operation in which Mr. Rabhan enlisted the criminal assistance of the general contractor in charge of constructing the catfish processing facility, Lee Jones. Mr. Jones was also sentenced by the U.S. District Court for the Southern District of Georgia for his participation in the fraud. The federal prosecution did not implicate the Bank or any of its employees in the fraud. In fact, the restitution orders entered against Messrs. Rabhan and Jones listed the Bank as a victim to whom restitution should be made.

its performance of its obligations.[5]  The Agency's letter stated that the Agency "cannot' and 'will not' honor or support any part of the guarantee."

34.    On November 21, 2003, the NAD docketed the Bank's appeal of the Agency's October 20, 2003 decision.

35.    In connection with its appeal, the Bank filed at least twelve Freedom of Information Act ("FOIA") requests directed to Agency offices seeking documents and information concerning the Bank's loan, the Agency's investigation resulting in its October 2003 determination letter, and the Agency's prior dealings with Mr. Erwin David Rabhan.  The Agency's uniform response to these requests was to delay production of clearly responsive documents, unnecessarily dispute the applicability of FOIA exemptions, and refuse to confirm that it had complied with FOIA by producing all responsive documents.  Even with the NAD's administrative processing of the appeal at an end, the Agency has yet to produce all of the documentation that the NAD regulations require it to make available to the Bank.  The Agency's failure to comply with the NAD regulations regarding production of exculpatory and potentially exculpatory evidence violated the Bank's due process rights.

36.    During the first NAD hearing, conducted over six days in June and August of 2004, the Bank introduced ample evidence to meet its burden of showing by a preponderance of the evidence that the Agency's October 20, 2003 determination was erroneous.

---

[5] The October 20, 2003 adverse Agency determination letter was preceded by a May 22, 2003 preliminary determination by the Agency to dishonor the guarantee.  The October 20, 2003 determination was the underlying decision on appeal before the NAD.

37.    Of particular note, the Bank introduced extensive and specific evidence showing that the Agency's officials in Georgia had discovered, but failed to disclose, an attempt by Mr. Rabhan to defraud the Agency and another lender in 1995.

38.    This evidence showed that in 1995 Mr. Rabhan submitted fraudulent equipment invoices to a lender and the Agency in hopes of securing financing through the B&I guaranteed loan program.

39.    In October 1995, Agency officials in Georgia investigated and discovered Mr. Rabhan's fraudulent activity and no loan was made nor any guarantee issued.

40.    High-ranking Agency officials have testified to Congress concerning the Agency's missteps with respect to the Catfish loan and the Agency's obligation to disclose material negative information in the Agency's possession concerning a potential borrower to the lender before loan closing or issuance of a guarantee by the Agency.  Despite this obligation to disclose such 'red flag' information, the Agency withheld all information regarding its investigation of Mr. Rabhan from the Bank.  Moreover, the Agency did not report Mr. Rabhan to any law enforcement authority for further investigation or prosecution despite Departmental regulation 1700-2(7)(f)(2), which requires reporting of fraudulent or suspicious activity in Agency programs.

41.    Enterprise National Bank had no knowledge whatsoever of Mr. Rabhan's previous attempt to defraud when the Bank met with the very same Agency officials who had uncovered the 1995 fraud about guaranteeing a loan to Mr. Rabhan's Catfish business just three years later in 1998.  The Agency did not disclose Mr. Rabhan's prior attempt to commit loan fraud to the Bank.  The B&I program regulations place the burden of determining whether a loan

guarantee can or should be issued squarely on the Agency. Because the Agency was in sole possession of the information regarding Mr. Rabhan's prior attempt to commit banking fraud, it alone had the responsibility for ensuring that the Bank knew this specific information, that the Bank did not close the loan, and that the Agency did not issue the guarantee. In the end, the Agency withheld the information concerning Mr. Rabhan's 1995 attempt to defraud, permitted the Bank to close the loan, issued the guarantee, and then proceeded to dishonor its guarantee after Mr. Rabhan and his co-conspirators succeeded in defrauding the Bank and the Agency on the Catfish loan.

42.     Had the Bank known of Mr. Rabhan's prior attempt to defraud, the Bank never would have closed the loan to Catfish.

43.     It was the Agency's bad faith in withholding evidence of Mr. Rabhan's fraudulent activity that set the stage for the loan default and the Agency's loss.

III.    **Throughout the NAD proceedings the Agency attempted to withhold evidence of a bribery, kickback, and loan manipulation scheme between Mr. Rabhan and Agency officials**

44.     During the first NAD hearing, the Bank presented evidence of a bribery, kickback, and loan manipulation scheme involving Agency officials with the B&I loan program. This evidence showed that the scheme involved Mr. Rabhan and others acting at his direction.

45.     The Bank discovered the scheme only after counsel for Bank received a whistleblower call on March 8, 2004 from Howard Franklin, the former Georgia state office supervisor in charge of the B&I loan program in Georgia.

46.     As Mr. Franklin explained, Agency officials in the national office were engaged in a scheme to manipulate the B&I loan program. As part of this scheme, Agency officials were

11

allegedly taking kickbacks from borrowers, including Mr. Rabhan, to push through questionable loans, and were actively engaged in covering up their activities and keeping this information from the lenders making loans under the program. These national office officials instructed Georgia state office staff to withhold this information from the Bank.

47.    Even though Mr. Franklin had evidence directly related to the Catfish guarantee on appeal, and specifically to whether the Bank's actions were the cause of the losses alleged by the Agency, the Agency steadfastly refused to make Mr. Franklin available for questioning during the first hearing and uniformly withheld all documentary evidence described by Mr. Franklin as supporting his whistleblower allegations.

48.    After denying the Bank's request for a subpoena to secure Mr. Franklin's testimony and documents under NAD regulations, the Hearing Officer issued a determination on October 12, 2004 finding for the Agency on the underlying claims.

49.    The Hearing Officer's Determination notes that he refused to consider any evidence of the Agency's own negligence or wrongdoing.

50.    On November 12, 2004, the Bank requested a review by the NAD Director of the Hearing Officer's October 12, 2004 determination.

51.    The Bank's request was based, in part, on the Agency's due process violations in preventing Mr. Franklin from testifying, and unjustifiably withholding numerous relevant documents from production under the NAD regulations.

52.    On February 7, 2005, the Deputy Director of the NAD issued a Director Review Determination finding that the Hearing Officer had improperly excluded evidence of Mr.

Franklin's whistleblower allegations and had failed to comply with NAD regulations in allowing the Agency to withhold relevant documentary evidence from the Bank.

53.    The Deputy Director remanded the appeal to a new Hearing Officer to consider the Bank's subpoena and document requests, to take action to eliminate the Agency's violations of the Bank's due process rights, and to re-open the hearing and issue a new appeal determination if deemed necessary by the Hearing Officer on remand.

**IV.    The Agency continued to act in bad faith in the remand proceedings and went so far as to threaten an adverse witness and to attempt to influence the new Hearing Officer through a prohibited ex parte communication**

54.    On March 24, 2005, NAD Hearing Officer Charles R. Mills (assigned to conduct the remand proceedings) approved the issuance of a subpoena requiring whistleblower Howard Franklin's attendance at the remand hearings called for the purpose of taking Mr. Franklin's testimony and resolving certain of Mr. Mills' questions regarding the parties' underlying factual contentions.

55.    Prior to the remand hearings scheduled for May 4th and 5th, 2005, the Agency disclosed that while Mr. Franklin would be made available to testify with use of his documents, the Bank would not be permitted to review or copy the documents prior to Mr. Franklin's scheduled testimony.

56.    Without waiving its objections to proceeding without access to the documentary evidence, the Bank took Mr. Franklin's testimony in the remand hearings and elicited specific testimony concerning the Catfish loan, Mr. Rabhan's prior dealings with the Agency, the bribery, kickback, and loan manipulation scheme at the Agency, and other relevant topics.

57.    At the outset of his testimony Mr. Franklin refused to take the oath, explaining that the Agency had prevented him from preparing for his testimony by withholding access to his documents.  Mr. Franklin went on to state that he felt threatened by the Agency's representatives and Georgia state office staff, who, according to Mr. Franklin, had attempted to influence his subpoenaed testimony in the NAD hearing by calling his pension benefits into question should he testify.  At the conclusion of Mr. Franklin's testimony on May 4, 2005, the Agency agreed to produce a small portion of the documentation Mr. Franklin relied upon during his testimony. However, the Agency refused to release the balance of the information, claiming, among other things, that it was not relevant despite the fact that Mr. Franklin had referenced it during his testimony and repeatedly referred to his documents as containing the most complete answers to the questions put to him.

58.    On May 31, 2005, the Bank renewed its request to the NAD for a subpoena duces tecum requiring production of Mr. Franklin's documents by the Agency.

59.    The subpoena request also sought production of a complete and unredacted copy of the Report of Investigation compiled by the Agriculture Department's Office of Inspector General ("OIG").  As the Agency openly acknowledged during the remand hearings, the unredacted OIG report on the Catfish loan formed the basis for the Agency's October 20, 2003 adverse determination letter.  Although NAD regulations required its production in December 2003, the Agency had steadfastly refused to produce the report or the documentation supporting it for more than 18 months at that point.

60.    On June 9, 2005, the Hearing Officer issued a National Appeals Division subpoena to the Agency's national administrator requiring production, to both the NAD and to

14

the Bank's counsel, of Mr. Franklin's whistleblower documents, the complete and unredacted

OIG report of investigation on the Catfish loan, and other specific documents relevant to the

proceedings.

61.     The Hearing Officer was careful to counsel the Agency that any documents

submitted to the NAD must also be provided to the Bank to avoid a prohibited ex parte

communication under NAD regulations.

62.     Rather than complying with the subpoena and the Hearing Officer's instructions,

the Agency knowingly made one production of documents to the Hearing Officer while

producing a much smaller and significantly redacted set of documents to the Bank.  The

Agency's production to the Bank did not comply with the terms of the subpoena and violated the

Bank's due process rights by prohibiting access to documentary evidence that the Agency had

used to support its case against the Bank.

63.     On July 15, 2005, Hearing Officer Mills issued a Notice to Agency to Show

Cause Why Its Claim Or Interest In Subject Appeal Should Not Be Dismissed, Denied,

Disregarded, or Otherwise Adversely Affected On Account Of Its Violation of Rules Prohibiting

Ex Parte Communication (the "Notice").

64.     In the Notice, Hearing Officer Mills found that Agency counsel Mark Stevens,

acting as a representative and on behalf of the Agency:

(1) misled the NAD in describing the relevancy of Mr. Franklin's whistleblower

documents;

(2) failed to comply with the NAD's June 9, 2005 subpoena duces tecum; and

(3) knowingly violated the prohibition in 7 C.F.R. § 11.7(b) against engaging in ex parte communication.[6]

65.     Following submission of briefs by the Agency and the Bank in response to the NAD's Notice to the Agency to Show Cause, as well as written summations on all issues discussed during the remand proceedings, Hearing Officer Mills issued his Remand Determination on December 2, 2005.

66.     In the Remand Determination, the Hearing Officer found that the Agency violated the NAD regulations prohibiting ex parte communications concerning the merits of an appeal. The Hearing Officer noted:

> The communication consisted of an OIG Report of Investigation (ROI) that one of [the Agency's] representatives, an attorney with USDA Office of General Counsel, submitted to NAD, on [the Agency's] behalf on June 30, 2005. Although [the Agency] submitted the ROI to NAD, it refused to provide the same to [the Bank.] [The Agency] provided [the Bank] with a heavily redacted version of the ROI that, due to the redactions, differed from the ROI received by NAD. The ROI submitted to NAD was relevant to the merits of the appeal because [the Agency] relied upon it as a basis for its adverse decision. By sending this evidence to NAD and withholding it from [the Bank], [the Agency] made a prohibited ex parte communication. [The Agency] made the prohibited ex parte communication after it received repeated notice not to do so.

(emphasis added).

67.     The Hearing Officer also noted that Agency counsel, in seeking to explain his conduct on behalf of the Agency, "misstate[d] facts" and made "unsupported claims."

68.     As a result of the Agency's conduct, the Hearing Officer formally disregarded all evidence submitted by the Agency as part of its ex parte communication and segregated that evidence within the NAD case record.

---

[6] 7 C.F.R. § 11.7(b) states: "No interested person shall make or knowingly cause to be made to any officer or employee of the [NAD] an *ex parte* communication relevant to the merits of the appeal."

69.     In the operative and enforceable portion of the Remand Determination, the Hearing Officer found that the Bank had met its regulatory burden of proof by proving by a preponderance of the evidence that the Agency's decision to reduce, deny, and dishonor its B&I program loan guarantee was erroneous.

70.     Following the Agency's failure to pursue a further administrative appeal, the Remand Determination became final and enforceable by this Court.

71.     To summarize, throughout the course of the Agency's interaction with the Bank and the conduct of the NAD proceedings, the Agency has:

(1) withheld material negative information concerning the fact that the borrower's principal had previously attempted to defraud the very same Agency office involved in the Catfish loan;

(2) withheld evidence of a bribery, kickback, and loan manipulation scheme within the Agency involving the Bank's loan;

(3) sought to prevent Agency whistleblower Howard Franklin from providing relevant testimony concerning the loan manipulation scheme and the Bank's loan;

(4) threatened Mr. Franklin in an attempt to influence his subpoenaed testimony before the NAD;

(5) refused to provide the Bank with the complete OIG Report of Investigation that it relied upon in issuing its decision to dishonor the Bank's guarantee; and

(6) knowingly violated the prohibitions against ex parte communications and then attempted to mislead the NAD in hopes of explaining away its violation.

72.     Finally, contrary to Agency counsel's January 12, 2006 statement that the Agency would process the Bank's loss claim for payment in full, the Agency has attempted to turn the Hearing Officer Remand Determination on its head by ignoring its conclusion and asserting a right to further reduce the loan guarantee despite the fact that the Agency lost in the NAD proceedings and elected not to appeal.

73.     The Agency's March 3, 2006 decision to further reduce and dishonor the Bank's loan guarantee is contrary to the plain language of the Remand Determination, is unsupportable, and blatantly violates the requirement placed on the Agency to abide by its own regulations and the rulings of its National Appeals Division.

## COUNT 1

### (Declaratory Judgment)

74.     The Bank realleges and incorporates paragraphs 1 through 73 as if fully set forth herein.

75.     The U.S. Department of Agriculture, through its Rural Development Division, has unjustifiably reduced, revoked, rescinded, and dishonored its full faith and credit loan guarantee while mistakenly relying upon a decision in the Bank's favor by the National Appeals Division. An actual controversy exists between the Bank and the Agency as to the Bank's rights with respect to the Agency's loan guarantee program.

76.     The Bank prays that this Court declare and determine, pursuant to 28 U.S.C. § 2201, the rights of the Bank under the Agency's Business and Industry guaranteed loan program.

## COUNT II

### (Order Compelling Agency Action)

77.    The Bank realleges and incorporates paragraphs 1 through 73 as if fully set forth herein.

78.    The Agency has unlawfully refused to comply with the final determination of the NAD.

79.    As a result of the Agency's conduct, the Bank seeks an order compelling the Agency to comply with the NAD Remand Determination by processing the remainder of the Bank's loss claim for payment in full plus accrued interest without delay.

WHEREFORE, Plaintiff requests that this Court:

1) Accept jurisdiction of this matter;

2) Cause the complete case record developed below to be produced to this Court and to Plaintiff by the Defendant;

3) Issue an appropriate Order finding that the Agency has unlawfully withheld action required by law and compelling the Agency to process the unpaid portion of the Bank's guaranteed loan loss claim for immediate payment in full with accrued interest;

4) Declare that Defendant's actions alleged herein violate the Due Process Clause of the United States Constitution; and

5) Provide such other and further relief as the Court deems just and proper.

[SIGNATURE OF COUNSEL APPEARS ON THE FOLLOWING PAGE.]

Respectfully submitted, this 21st day of July, 2006.


JOHN J. RICHARD
D.C. Bar No. 480212
JOHN M. GROSS
Georgia Bar No. 313520 (motion for admission *pro hac vice* submitted
    herewith)

    POWELL GOLDSTEIN LLP
    One Atlantic Center
    Fourteenth Floor
    1201 West Peachtree Street, NW
    Atlanta, Georgia  30309-3488
    (404) 572-6600 – Telephone
    (404) 572-6999 – Facsimile

WILLIAM C. CRENSHAW
D.C. Bar No. 968545

    POWELL GOLDSTEIN LLP
    Third Floor
    901 New York Avenue, NW
    Washington, DC 20001-4413
    (202) 347-0066 – Telephone
    (202) 624-7222 – Facsimile

        Attorneys for Plaintiff
        Enterprise National Bank

#1033140/2

EXHIBIT

A



POWELL
GOLDSTEIN LLP

Atlanta   ■   Washington

JOHN J. RICHARD
DIRECT DIAL: (404) 572- 6631
JJRICHARD@POGOLAW.COM

January 12, 2006

**VIA FACSIMILE (404) 347-1065
AND U.S. MAIL**

Mark Lee Stevens, Esq.
USDA – Office of General Counsel
1718 Peachtree Road, Suite 576
Atlanta, GA 30309-2409

Re:   In the Matter of Enterprise National Bank and Rural Business Cooperative Service,
      USDA National Appeals Division, Case No. 2004S000154

Dear Mark:

I am writing to memorialize our telephone conversation of this morning in which we discussed the Agency's payment of Enterprise's loss claim in the above matter. During our call you related to me that the Agency has elected not to file an appeal to the NAD Director of hearing officer Mills' determination. Further you confirmed that the Agency received the appeal determination on December 5, 2005 and that the Agency's deadline to file such an appeal expired on December 27, 2005. As you know, because the Agency has not appealed the hearing officer's determination, it becomes final Agency action for purposes of appeal and payment of the Bank's loss claim. See 7 C.F.R. § 11.8(f). We discussed that both the state and national offices of Rural Development are currently processing the Bank's loss claim for payment in full plus accrued interest.

The Agency has thirty days from the date it received the hearing officer's ruling to implement the determination. See 7 U.S.C. § 7000; 7 C.F.R. § 11.12. See also NAD Hearing Guide section 6, II, A. (available online at http://www.nad.usda.gov/hearing_guide.html) ("When a final determination finds that an agency erred in the adverse decision, the head of the agency shall implement the determination within thirty days of receiving notice of the final determination, as specified in 7 U.S.C. § 7000 and 7 C.F.R. § 11.12.). Based on the Agency's receipt of Mr. Mills' ruling on December 5, 2005, the Agency was required to implement the decision by January 4, 2006. It is my understanding based on our discussion this morning and my follow-up voicemail to you, that the Agency has begun its implementation by processing the loss claim for payment.

One Atlantic Center  ■  Fourteenth Floor  ■  1201 West Peachtree Street, NW  ■  Atlanta, GA 30309-3488
Tel: 404.572.6600  ■  Fax: 404.572.6999
www.pogolaw.com

Mark Lee Stevens, Esq.
January 12, 2006
Page 2

Understandably, the Bank would like to see its claim processed as quickly as possible. Please inform me at your earliest convenience when the Bank can expect to receive payment. Finally, the Agency's payment should be forwarded to the Bank (with a copy to this office) at the following address:

Enterprise National Bank
c/o Joseph Porter – Chairman
11811 U.S. Highway One
North Palm Beach, FL 33408

As always, I look forward to hearing from you.  Please feel free to contact me with any questions or concerns.

Very truly yours,

John J. Richard

For Powell Goldstein LLP

cc:    Enterprise National Bank
       Alan R. Simon, Esq.
       John M. Gross, Esq.

#976361

EXHIBIT

B

**USDA**

**Rural**
Development

**United States Department of Agriculture**
**Rural Development**
**State Director**

March 3, 2006

Mr. Randall A. Ezell
President/CEO/Chairman of the Board
Enterprise National Bank of Palm Beach
3980 RCA Blvd., Suite 8012
Palm Beach Gardens, FL  33410

Re:    Business and Industry Guaranteed Borrower
       Catfish International, Inc., Case #10-53-593466838

Dear Mr. Ezell:

The Agency received the Bank's submission of RD Form 449-30, Guaranteed Loan Report of
Loss, with attachments through your legal counsel, Powell Goldstein LLP, on February 6, 2006.
The Agency reviewed the information and made the following determinations:

1.    <u>Principal Balance</u>.  Based on the NAD Remand Hearing Determination dated December
      2, 2005, the principal balance is reduced by $3,030,000 as of the NAD Hearing Officer's
      determination.
      (a)    $80,000 - The NAD Remand Hearing Officer determined that ". . . failure to build
             the structures *[maintenance shed and guardhouse]* occasioned an $80,000 loss in
             the value of the collateral" (page 12 of 20, NAD Remand Hearing Officer
             Determination).
      (b)    $2,950,000 -  The NAD Remand Hearing Officer determined that "Appellant's
             failure to perform appropriate due diligence to verify the existence of either the
             funds or the equipment created conditions that allowed the loan to proceed
             without the required equity injection and without collateral worth $2,950,000.
             This occasioned a loss of $2,950,000" (page 14 of 20, NAD Remand Hearing
             Officer Determination).

2.    <u>Interest Balance</u>.  The guaranteed portion of the interest accrual as calculated by the
      Agency from March 2001 until December 31, 2005 is $1,072,693.40.  This amount is
      identified in Attachment One.

3.    <u>Real Estate Sales Proceeds/Liquidation Expenses/Attorney Fees</u>.  The Agency
      determined that the approved expenses were (a) liquidation expenses - $121, 444.04 and
      (b) attorney fees - $14,728.15.  Liquidation expenses must be reasonable and directly
      connected to the liquidation on the defaulted loan.  The main difference is the deduction
      of the installation costs related to the fence, $5,800, which was not approved by the

**To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and
Independence Avenue, SW, Washington, DC  20250-9410 or call (202)720-5964 (voice or TDD).  USDA is an equal
opportunity provider and employer."**

Agency, and the attorney fees of $1,366.75, which cited another legal case. The total difference of $6,279.22 is identified in Attachment Two.

Based on the above calculations, the Agency will submit a revised Guaranteed Loan Report of Loss to the Finance Office for a payment of $956,252.19 to the Lender. The Agency's Finance Office will review the calculation to ensure correct payment and make payment to the Lender.

If you have further questions, please contact Karen Bryan, Director, Business and Cooperative Services Programs, at (706)546-2154.

Sincerely,

F. STONE WORKMAN
State Director
USDA Rural Development

Enclosures

cc:    National Office
       Business Programs
       Waynesboro RDO
       Office of the General Counsel
       Powell Goldstein, John J. Richard

355 E. Hancock Avenue, Stop #300, Athens, GA  30601-2768, (706)546-2162,  Fax #:  (706)546-2152,
TDD:  (706)546-2034

*Committed to the future of rural communities*

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 14th and Independence Avenue, SW, Washington, DC  20250-9410 or call (202)720-5964 (voice or TDD).  USDA is an equal opportunity provider and employer."

Lender:  Enterprise National Bank of West Palm Beach

Attachment One
CALCULATIONS BASED ON REDUCING PRINCIPAL BY $3,030,000 ON NAD ADVERSE DECISION DATE (12/2/05)

| OUTSTANDING PRINCIPAL | FROM DATE: | TO DATE: | DAYS OF INTEREST | RATE OF INTEREST | DAILY ACCRUAL | ACCRUED INTEREST | CUMULATIVE INTEREST |
|---|---|---|---|---|---|---|---|
| 4,363,393.55 | 3/1/2001 | 3/9/2001 | 8 | 11.00% | 1,333.26 | 10,666.07 | |
| 4,383,393.55 | 3/9/2001 | 3/15/2001 | 7 | 11.00% | 1,339.37 | 9,375.59 | |
| 4,429,892.09 | 3/15/2001 | 3/29/2001 | 14 | 11.00% | 1,353.58 | 18,950.09 | |
| 4,413,572.32 | 3/30/2001 | 4/1/2001 | 1 | 11.00% | 1,348.59 | 1,348.59 | |
| | | | | | | 40,340.35 | 40,340.35 |
| | | | | | | | |
| 4,413,572.32 | 4/1/2001 | 4/9/2001 | 8 | 9.50% | 1,164.69 | 9,317.54 | |
| 4,455,625.52 | 4/9/2001 | 5/1/2001 | 22 | 9.50% | 1,175.79 | 25,867.38 | |
| | | | | | | 35,184.92 | 75,525.27 |
| | | | | | | | |
| 4,455,625.52 | 5/1/2001 | 5/8/2001 | 7 | 9.50% | 1,175.79 | 8,230.53 | |
| 4,515,419.64 | 5/8/2001 | 6/1/2001 | 23 | 9.50% | 1,191.57 | 27,406.09 | |
| | | | | | | 35,636.62 | 111,161.89 |
| | | | | | | | |
| 4,515,419.64 | 6/1/2001 | 6/27/2001 | 26 | 9.50% | 1,191.57 | 30,980.80 | |
| 4,544,090.65 | 6/27/2001 | 7/1/2001 | 4 | 9.50% | 1,199.14 | 4,796.54 | |
| | | | | | | 35,777.34 | 146,939.23 |
| | | | | | | | |
| 4,544,090.65 | 7/1/2001 | 7/10/2001 | 9 | 8.25% | 1,041.35 | 9,372.19 | |
| 4,544,554.69 | 7/10/2001 | 8/1/2001 | 21 | 8.25% | 1,041.46 | 21,870.67 | |
| | | | | | | 31,242.86 | 178,182.08 |
| | | | | | | | |
| 4,544,554.69 | 8/1/2001 | 9/1/2001 | 30 | 8.25% | 1,041.46 | 31,243.81 | 209,425.90 |
| 4,544,554.69 | 9/1/2001 | 10/1/2001 | 30 | 8.25% | 1,041.46 | 31,243.81 | 240,669.71 |
| | | | | | | | |
| 4,544,554.69 | 10/1/2001 | 11/1/2001 | 30 | 7.50% | 946.78 | 28,403.47 | 269,073.18 |
| 4,544,554.69 | 11/1/2001 | 12/1/2001 | 30 | 7.50% | 946.78 | 28,403.47 | 297,476.65 |
| 4,544,554.69 | 12/1/2001 | 1/1/2002 | 30 | 7.50% | 946.78 | 28,403.47 | 325,880.11 |
| | | | | | | | |
| | | | | | | | |
| 4,544,554.69 | 1/1/2002 | 10/1/2002 | 270 | 6.25% | 788.99 | 213,026.00 | |
| 4,544,554.69 | 10/1/2002 | 10/23/2002 | 23 | 6.25% | 788.99 | 18,146.66 | |
| 4,543,679.69 | 10/23/2002 | 11/1/2002 | 7 | 6.25% | 788.83 | 5,521.83 | |
| 4,543,679.69 | 11/1/2002 | 1/1/2003 | 60 | 6.25% | 788.83 | 47,330.00 | |
| | | | | | | 284,024.49 | 609,904.60 |
| | | | | | | | |
| 4,543,679.69 | 1/1/2003 | 3/1/2003 | 60 | 5.75% | 725.73 | 43,543.60 | |
| 4,513,679.69 | 3/1/2003 | 4/1/2003 | 30 | 5.75% | 720.93 | 21,628.05 | |
| | | | | | | 65,171.65 | |
| | | | | | | | |
| 4,513,679.69 | 4/1/2003 | 7/1/2003 | 90 | 5.75% | 720.93 | 64,884.15 | |
| | | | | | | | |
| 4,500,679.69 | 7/1/2003 | 8/1/2003 | 30 | 5.50% | 687.60 | 20,628.12 | |
| | | | | | | | |
| 4,493,179.69 | 8/1/2003 | 9/1/2003 | 30 | 5.50% | 686.46 | 20,593.74 | |
| | | | | | | | |
| 4,483,179.69 | 9/1/2003 | 1/1/2004 | 120 | 5.50% | 684.93 | 82,191.63 | |

Lender: Enterprise National Bank of West Palm Beach

**Attachment One**

**CALCULATIONS BASED ON REDUCING PRINCIPAL BY $3,030,000 ON NAD ADVERSE DECISION DATE (12/2/05)**

| OUTSTANDING PRINCIPAL | FROM DATE: | TO DATE: | DAYS OF INTEREST | RATE OF INTEREST | DAILY ACCRUAL | ACCRUED INTEREST | CUMULATIVE INTEREST |
|---|---|---|---|---|---|---|---|
| | | | | | | 253,469.27 | 863,373.88 |
| | | | | | | | |
| 4,483,179.69 | 1/1/2004 | 3/1/2004 | 60 | 5.50% | 684.93 | 41,095.81 | |
| 4,481,879.69 | 3/1/04 | 7/1/04 | 120 | 5.50% | 684.73 | 82,167.79 | |
| 4,481,334.69 | 7/1/04 | 10/1/04 | 90 | 5.75% | 715.77 | 64,419.19 | |
| 4,481,034.69 | 10/1/04 | 1/1/05 | 90 | 6.25% | 777.96 | 70,016.17 | |
| | | | | | | 257,698.96 | 1,121,072.84 |
| | | | | | | | |
| 4,480,734.69 | 1/1/05 | 4/1/05 | 90 | 6.75% | 840.14 | 75,612.40 | |
| 4,480,734.69 | 4/1/05 | 7/1/05 | 90 | 7.25% | 902.37 | 81,213.32 | |
| 4,480,684.69 | 7/1/05 | 8/1/05 | 30 | 7.75% | 964.59 | 28,937.76 | |
| 4,480,120.94 | 8/1/05 | 9/30/05 | 60 | 7.75% | 964.47 | 57,868.23 | |
| 4,480,120.94 | 9/30/05 | 12/1/05 | 60 | 8.25% | 1,026.69 | 61,601.66 | |
| 4,480,120.94 | 12/1/05 | 12/2/05 | 1 | 8.25% | 1,026.69 | 1,026.69 | |
| | | | | | | 306,260.06 | 1,427,332.89 |
| | Percent of Guarantee | | | | | | 75% |
| | Accrued Interest - Guaranteed Portion | | | | | | 1,070,499.67 |
| 3,360,090.71 | Percent of Guarantee 75% times $4,480,120.94 | | | | | | |
| 3,030,000.00 | Minus Loss Claim Reduction ($2,950,000 + 80,000) | | | | | | |
| 330,090.71 | Principal Balance as of NAD Adverse Decision Date | | | | | | |
| | | | | | | | |
| 330,090.71 | 12/2/05 | 1/1/06 | 29 | 8.25% | 75.65 | 2,193.73 | |
| | | | | | | | 1,072,693.40 |
| | | | | | | | |
| | | | | | | | |
| **Basis:** | 30/360 | **Interest =** | | **1740** | | | |

| | |
|---|---|
| **Accrued Interest - Guaranteed Portion** | 1,072,693.40 |
| **Unpaid Principal Balance- Guaranteed Portion** | 330,090.71 |
| **Protective Advance for Insurance in 2002 - Guaranteed Portion ($16,980.00 *.75)** | 12,735.00 |
| **Total Unpaid Balance - Guaranteed Portion** | 1,415,519.10 |
| **Sales Proceeds of Collateral (Real Estate) - Guaranteed Portion ($612,355.89*.75)** | 459,266.92 |
| **Revised Final Loss Claim** | 956,252.19 |

3/3/2006  2:25 PM

Lender: Enterprise National of West Palm Beach

Attachment Two
CALCULATION OF PROCEEDS FROM SALE OF ASSETS (REAL ESTATE ONLY)

| | |
|---:|---|
| 750,000.00 | Sales Price per Settlement Sheet |
| 750.00 | Intangible Taxes |
| 721.92 | County Taxes 1/1-27/06 |
| 748,528.08 | Net Settlement Proceeds |

| | |
|---:|---|
| 121,444.04 | Liquidation Expenses |
| 14,728.15 | Attorney Fees |
| | |
| 612,355.89 | Net Sales Proceeds to Apply to Debt |
| 606,076.67 | Lender Claimed |
| 6,279.22 | Difference |

| | Lender | Agency | Difference |
|---|---:|---:|---:|
| **Liquidation Expenses** | 126,356.51 | 121,444.04 | 4,912.47 |
| | | | |
| Fence | | | (5,800.00) |
| Water/Sewer 2/10/05 - p. 122 | | | 12.50 |
| Taxes 2005 - p159 | | | 0.03 |
| | | | |
| Add Insurance Reimbursement (Since Lender applied insurance funds to principal and reduced the principal, liquidation expenses should not have been reduced.) | | | 875.00 |
| Total Liquidation Expenses Difference | | | (4,912.47) |

| | Lender | Agency | Difference |
|---|---:|---:|---:|
| **Attorney Fees** | 16,094.90 | 14,728.15 | 1,366.75 |
| | | | |
| Advise on case Taco Joy v. Huddleston | | | (692.35) |
| Advise on case Taco Joy v. Huddleston | | | (674.40) |
| Total Attorney Fees Difference | | | (1,366.75) |

| | |
|---|---:|
| Total Difference (Liquidation/Attorney Expenses) | 6,279.22 |

3/3/2006  3:53 PM

USDA
Form RD 449-30
(Rev. 12-99)

**GUARANTEED LOAN REPORT OF LOSS**
**TRANSACTION 4041**

FORM APPROVED
OMB NO. 0676-0137

**INSTRUCTIONS-TYPE IN CAPITALIZED ELITE TYPE IN SPACES MARKED** ( ) Complete Items 1-6, 10-12, 15-34, 36-40, and 46-52 when report type is 1. Complete Items 1-6, 10-15, 30-34, and 36-52 when report type is 2. See Reverse, 3 TABS & 2 SPACES.

| 1. CASE NO. ST CO    BORROWER'S ID | 2A. AGENCY LOAN NO. | 2B. LOAN TYPE | 3A. REPORT TYPE CODE | 3B. IS THE FINAL ESTIMATED LOSS PAYMENT UNDER THE TYPE CODE CHECKED? |
|---|---|---|---|---|
| 10-083-593466833 | 50 | BI | 2 | ☐ YES    ☐ NO |

| 4. BORROWER NAME | 5. LENDER ID NO. (IRS Tax No) | 6. AGENCY'S LENDER BRANCH NO. |
|---|---|---|
| Catfish Int, Inc. | 650159259 | 1 |

| 7. CHECK ISSUE CODE 1 = SYSTEM GENERATED 2 = MANUAL CHECK 3 = NO CHECK ISSUED (F.O. Only) 4 = REFUND | 8. DATE MANUAL CHECK    YR ISSUED MO    DA    (F.O. Only) | 9. DATE OF DEPOSIT MO    DA    YR    (F.O. Only) | 10. DATE OF SETTLEMENT MO    DA    YR 12-02-2005 |
|---|---|---|---|

| GUARANTEED LOAN ITEMS: | $ DOLLARS | LOSS GUARANTEED: | $ DOLLARS |
|---|---|---|---|
| 11. PRINCIPAL BALANCE | $440,120.95 | 31. PERCENT OF LOSS GUARANTEED | 75 (Percent) |
| 12. ACCRUED INTEREST OWED | $1,430,257.86 | 32. AMOUNT TO BE PAID (Item 30 X Item 31) | $956,252.19 |
| 13. PRINCIPAL BALANCE OWED ON PROTECTIVE ADVANCES | $16,980.00 | 33. (Sum of Prin. Advance + item 12) X item 31) | $4,530,608.00 |
| 14. ACCRUED INTEREST ON PROTECTIVE ADVANCES | | 34. MAXIMUM LOSS ALLOWED (Lessor of items 32 or 33) | $956,252.19 |
| 15. TOTAL (Add items 11 - 14) | $1,887,358.81 | 35. ALLOWANCES TO LENDER LIQUIDATION COST (F.O. Only) | |

| PRIOR LIEN AMOUNTS OWED TO SETTLEMENT DATE: | | ADJUSTMENTS TO PROTECTIVE ADVANCES & INTEREST | |
|---|---|---|---|
| 16. REAL ESTATE DEBTS | | 36. PROTECTIVE ADVANCES PLUS INTEREST (Items 13 + 14) X item 31) | $12,735.00 |
| 17. PERSONAL PROPERTY DEBTS | | 37. REMAINING BALANCE LOSS GUARANTEE (Item 34 minus 36) | $943,517.19 |
| 18. UNPAID TAXES, ASSESSMENTS, GROUND RENTS, ETC. | | 38. PERCENT OF GUARANTEED PORTION HELD BY LENDER | 100 (Percent) |
| 19. TOTAL PRIOR LIENS (Add items 16-18) | $0.00 | 39. LOSS ON GUARANTEED PORTION HELD BY LENDER OR HOLDER (Item 37 X item 38) | $943,517.19 |

| COLLATERAL: | | 40. AMOUNT DUE LENDER (Item 36 + item 39) | $956,252.19 |
|---|---|---|---|
| 20. REAL PROPERTY VALUE | $612,355.89 | | |
| 21. CHATTEL PROPERTY VALUE | | AMOUNT DUE LENDER OR USDA: | |
| 22. VALUE OF PERSONAL AND CORPORATE GUARANTEES | | 41. AMOUNT PAID ON ESTIMATED LOSS | $0.00 |
| 23. TOTAL (Add items 20 - 22) | $612,355.89 | 42. BALANCE DUE LENDER (Item 40 minus 41 if positive) | $956,252.19 |
| 24. NET COLLATERAL (Item 23 minus item 19) | $612,355.89 | 43. INTEREST ON OVERPAYMENT (Accrued interest due USDA) | $0.00 |
| 25. BASIC LOSS (See Reverse for Instructions) | $1,275,002.92 | 44. AMOUNT DUE USDA BY LENDER (Item 41 minus item 40 + item 43) | ($956,252.19) |

| ADJUSTMENT TO BASIC LOSS: | | 45. LENDER LOSS UNGUARANTEED | |
|---|---|---|---|
| 26. FUNDS BEING HELD | | 46. NAME OF LENDER | |
| 27. INCOME TO BE APPLIED TO DEBT | | 47. BY    X | |
| 28. BORROWER'S DEBT PAYMENT ABILITY - PRESENT VALUE | | 48. TITLE | 49. DATE |
| 29. TOTAL DEDUCTIONS (Add items 26 - 28) | $0.00 | 50. TENTATIVE APPROVAL - USDA OFFICIAL: BY X *[signature]* | |
| 30. ADJUSTED BASIC LOSS (Item 25 minus item 29) | $1275002.92 | 51. TITLE Acting State Director | 52. DATE 03-03-2006 |

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0575-0137. The time required to complete this information collection is estimated to average 25 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.