UNITED STATES DEPARTMENT OF AGRICULTURE
OFFICE OF THE SECRETARY
NATIONAL APPEALS DIVISION

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| ENTERPRISE NATIONAL BANK ) | |
| ) Case No. 2004S000154 | |
| And ) | |
| ) | |
| RURAL BUSINESS-COOPERATIVE SERVICE ) | |
| ) | |

## REMAND APPEAL DETERMINATION

On October 12, 2004, a National Appeals Division (NAD) Hearing Officer issued a determination upholding a Rural Business-Cooperative Service (RBS) decision dated October 20, 2003. In its adverse decision, RBS reduced a loss claim filed by Enterprise National Bank (Appellant) on a guaranteed Business and Industry (B&I) loan. The National Appeals Division (NAD) Deputy Director issued a Review Determination on February 7, 2005. She found that the Hearing Officer did not comply with procedural regulations when he returned exhibits to Appellant, failed to rule on the admissibility of exhibits, and denied Appellant's request for subpoenas.

The Deputy Director remanded the case to a Hearing Officer to: (1) allow Appellant to re-submit exhibits, (2) rule on the admissibility of exhibits, (3) consider Appellant's requests for subpoenas, and (4) take whatever further action is needed to process the appeal. The case was reassigned to me on February 10, 2005. I reopened the record, received Appellant's resubmitted exhibits, ruled on the admissibility of exhibits, and considered Appellant's requests for subpoenas. I held a hearing on May 4 and May 5, 2005, during which the parties questioned a subpoenaed witness and presented additional evidence and arguments. The hearing record closed on November 11, 2005.

The parties take the following positions. Appellant contends it lost $4,213,434 on a loan guaranteed by RBS, and it claims RBS must pay $3,160,075.50 (75 percent of the loss). RBS reduced Appellant's loss claim to zero. RBS contends Appellant cannot make any recovery under its guarantee because the entire loss was "occasioned" by Appellant's negligence. RBS claims: (1) Appellant was negligent in ensuring that all the loan funds were used for authorized purposes, and this occasioned a loss of $2,134,708; (2) Appellant did not ensure that construction was completed as proposed in the loan-processing appraisal and application, and this occasioned a loss of $1,062,053; (3) Appellant did not ensure that its borrower made a required equity injection of $2,950,000 to purchase equipment, and this occasioned a loss of

$2,950,000; and (4) Appellant withheld information from RBS and misrepresented draw requests, a claim for which RBS does not attribute a specific, unduplicated loss.

Appellant makes the following arguments:

1) RBS has steadfastly refused to participate fully in the NAD appeal process and has violated Appellant's due process rights by withholding relevant evidence that RBS was required by regulation to include in its Agency Record and was further required to produce by a NAD subpoena and subsequent NAD order. Most critically, RBS continues to improperly withhold, and has objected to NAD's production of, the Office of Inspector General's ("OIG") Report of Investigation that it admits it relied upon in reaching the adverse decision on appeal;

2) RBS knowingly engaged in an improper ex parte communication with NAD in this case and has not shown good cause why its arguments and evidence should not be completely disregarded as a result. Instead, RBS's responses to NAD's Notice to Show Cause concerning the ex parte communication have been riddled with mischaracterizations of not only the evidence, but also of recorded telephone discussions between and among NAD and respective counsel for the parties;

3) The evidence, discussion, and briefing during and after the remand hearing in May 2005 show that RBS's decision is erroneous because the preponderance of the evidence does not support RBS's damages allegations;

4) Appellant has shown that the loss on this loan occurred because RBS possessed negative information about the borrower who received Appellant's guaranteed loan, and RBS did not follow its existing policy of disclosing such information. Instead, RBS allowed Appellant to close its guaranteed loan to a borrower whose principal RBS knew to have attempted to defraud RBS and another lender only a few years before; and

5) RBS's case on the issues delineated in its October 20, 2003, adverse decision is unsupported by the evidence in the Agency Record.

RBS's adverse decision refers to "misrepresentation" by Appellant. The rules that govern the B&I program provide, in part, that a B&I loan guarantee is incontestable except for fraud or misrepresentation in which a lender participates, condones, or has actual knowledge of at the time it becomes a lender. Although RBS mentioned misrepresentation, its representatives repeatedly testified that RBS did not contest or deny Appellant's loan guarantee under the "fraud or misrepresentation" clause. RBS indicates the alleged misrepresentation is not cause to deny the guarantee but is cause to reduce Appellant's loss claim to the extent negligence/misrepresentation occasioned a loss. As RBS did not contest the loan guarantee under the fraud or misrepresentation rules, those rules are not at issue.

Enterprise National Bank
Case No. 2004S000154

Based on the evidence and arguments submitted by the parties and the program rules that apply, I conclude that RBS erred in its decision to reduce Appellant's loss claim to zero. The rationale for my decision follows.

## STATEMENT OF ISSUES

The issue is whether RBS followed its rules when it reduced Appellant's loss claim to zero. I had to answer the following questions to reach my decision:

1. Did RBS make an ex parte communication relevant to the merits of the appeal to a NAD official, and if so, is that cause for RBS's interest in the appeal to be denied, disregarded, or otherwise adversely affected?

2. Did the use of loan funds for unauthorized purposes occasion a loss of $2,134,708?

3. Did construction deficiencies and negligence in construction oversight occasion a loss of $1,062,053?

4. Did Appellant fail to ensure that its borrower contributed $2,950,000 to the project to purchase equipment, and if so, did this occasion a loss of $2,950,000?

5. As RBS did not associate a specific, unduplicated loss to its allegation that Appellant withheld information and misrepresented draw requests, is the allegation grounds to reduce Appellant's loss claim?

6. Did RBS cause the losses on subject loan by withholding adverse information from Appellant about the borrower who received the loan in question?

## FINDINGS OF FACT (FOF)

1. This case arises from a $5,000,000 B&I loan made by Appellant to a company created by Mr. David Rabhan. The purpose of the loan was to build a catfish processing plant and related facilities. The case also involves Mr. Lee N. Jones (Contractor), who was the General Contractor employed to build and equip a catfish processing plant and other facilities. *(Case Record [CR] Vol. 2, Agency Record [AR] pages 179, 189-192)*

2. Mr. Rabhan first tried to obtain a B&I loan in 1995. He sought the 1995 loan from a lender unconnected with Appellant. As part of his loan request, Mr. Rabhan submitted invoices purporting to show that he had made a personal equity injection by prepaying $3,879,200 for equipment. The lender submitted a preapplication for a guarantee to a USDA Rural Development (RD) office. The USDA official who evaluated the 1995 proposal held a position now known as Area Specialist. The Area Specialist conducted her own independent investigation to verify the accuracy of Mr. Rabhan's invoices. She found that the invoices were fraudulent. The lender who submitted the 1995 preapplication withdrew its request for a loan guarantee. *(CR Vol. 69, Appellant Remand Exhibit F)*

Enterprise National Bank
Case No. 2004S000154

3. In 1998, Mr. Rabhan approached Appellant about a new B&I loan to build a catfish processing plant. Appellant agreed to loan Mr. Rabhan's company $5,000,000. *(CR Vol. 9, Appellant Exhibit A)*

4. Appellant asked RBS to guarantee the loan to Mr. Rabhan's company. The USDA office and personnel that handled Appellant's loan guarantee were different from those that discovered Mr. Rabhan's fraudulent invoices in 1995, and no one with USDA informed Appellant about the events that transpired with Mr. Rabhan in 1995. *(CR Vol. 69, Appellant Remand Exhibit F; Vol. 70)*

5. RBS agreed to guarantee 70 percent of Appellant's loan subject to certain conditions set out in a Conditional Commitment dated June 24, 1998. One of the conditions was that Mr. Rabhan inject $2,950,000 of his own money into the project to pay for equipment. RBS initially required the capital injection to be in cash in an interest-bearing account. *(CR Vol. 2, AR pages 243-254)*

6. At Appellant's request, RBS modified its Conditional Commitment. The modifications increased RBS's guarantee to 75 percent and made other changes. As modified, the Conditional Commitment authorized $5,000,000 in loan funds to be used to pay $280,000 for working capital; $200,000 for fees; and $4,520,000 for "building construction costs including site." RBS required Appellant to secure the loan with a first lien on inventory and accounts receivable, a leasehold mortgage on land and buildings, first lien on machinery and equipment and a lien on life insurance policies. *(CR Vol. 2, AR pages 232-254)*

7. RBS's modified Conditional Commitment set the following requirement for Mr. Rabhan's $2,950,000 equity injection: *(CR Vol. 2, AR page 233)*

   The equity injection in this project is to be derived from foreign currency credits. The lender must provide USDA, Rural Development with the following executed documents:

   1. Sworn affidavits from [Mr. Rabhan and the Contractor]
   2. Construction contract
   3. Supply Bond
   4. Construction Loan Agreement
   5. Term Loan Agreement

8. Appellant closed the B&I loan on July 19, 1999. At loan closing, the Contractor delivered a signed affidavit asserting that Mr. Rabhan had prepaid him $2,950,000. The affidavit stated in part:

   The undersigned, being duly sworn, states:....That the Owner has prepaid the amount of $2,950,000.00 to [Contractor] ... under the Construction Contract... and that the

    Prepaid Amount is currently being held by [Contractor] to be applied to the contract sum in accordance with the terms of the Construction Contract for the purchase, delivery and installation of all catfish processing and plant equipment required for the Project pursuant to the Construction Contract.... *(CR Vol. 3, AR pages 401-405; CR Vol. 10, Appellant Exhibit B, pages 212-214)*

9. Appellant accepted the Contractor's affidavit, along with a similar affidavit from Mr. Rabhan, as proof that Mr. Rabhan had prepaid the Contractor $2,950,000. Appellant did not check bank records or any other source to verify that the Contractor possessed the $2,950,000 he allegedly received from Mr. Rabhan. In reality, the Contractor never received $2,950,000, and he never delivered the required equipment. *(CR Vol. 19, Appellant Exhibit L, page 77; Vol. 128, Transcript pages 144-154)*

10. The planned use of the construction portion of the guaranteed loan was to construct a catfish processing plant, guardhouse, maintenance shed and daycare center, and to pay for a waste separator. Construction of the processing plant and daycare center did not conform precisely to the original plans. Mr. Rabhan never built the guardhouse and maintenance shed valued at $80,000. Nor did he install the waste separator valued at $305,054. *(CR Vol. 6, AR pages 1196-1261, 1394)*

11. Prior to construction, the proposed facilities, equipment and land had a prospective value of $7,100,000 as reflected in an appraisal dated March 30, 1999. The appraisal estimated that the replacement cost of the proposed daycare center and related site work was $511,000. *(CR Vol. 6, AR pages 1156-1158, 1196)*

12. As part of its loan servicing, Appellant obtained a new appraisal of the completed processing plant and daycare center on February 18, 2002. The appraiser found the facilities to be in "basically good condition." He also found that as of January 22, 2002, the highest and best use of the property had changed from a catfish processing plant and daycare center to an industrial facility with an associated office. He found that the property had an effective physical age of one year. To account for age and physical depreciation, he depreciated the replacement cost by $32,619. In his final analysis of the cost approach to value, he depreciated the replacement cost by an additional $457,000 due to functional obsolescence, which he defines in part as any loss in value resulting from over or under-improvement beyond the economic capacity of the property. Due to the change in highest and best use, the appraiser calculated the replacement cost of a "free standing office building" rather than a daycare center. He estimated that an office equal in size to the daycare center (3,900 square feet) would cost $328,224. The appraiser specified that certain components of the existing facilities "have not been included in the replacement cost analysis." Using three approaches to value (cost, income, and sales comparison), he arrived at a final appraised value of $940,000, which came to serve as the property's liquidation value. *(CR Vol. 6, AR pages 1293, 1326-1328, 1333-1334, 1355)*

13. The catfish processing plant never went into production. The Borrower fell behind on payments and Appellant liquidated the loan. Appellant acquired the real estate security at a foreclosure sale in June 2002. *(CR Vol. 19, Appellant Exhibit L, pages 21-24, 80-93; Vol. 64, Appellant exhibit T-78, page 15)*

14. Mr. Rabhan and the Contractor were indicted for conspiracy and bank fraud perpetrated against Appellant. They pled guilty. They were sentenced to prison and required to pay restitution. *(CR Vol. 19, Appellant Exhibit L, page 21; Vol. 64, Appellant Exhibits A-79 & Z-78)*

15. Appellant filed a loss claim dated November 20, 2002, seeking payment from RBS on the loan guarantee. As of the date of the loss claim, the total debt was $5,153,434. The value of the real estate collateral was $940,000, leaving a loss on the loan of $4,213,434. Appellant filed its loss claim for $3,160,075.50 (75 percent of the loss). *(CR Vol. 19, Appellant Exhibit K, page 482)*

16. RBS reduced Appellant's loss claim to zero on October 20, 2003, and Appellant filed an appeal to NAD. On November 21, 2003, NAD issued a Notice of Appeal. It informed RBS and Appellant of prohibitions on certain ex parte communications. During the appeal proceedings, NAD provided further notice related to the prohibition on ex parte communication. On June 30, 2005, an RBS representative made a written ex parte communication to NAD. The communication included an OIG Report of Investigation that RBS had relied upon as a basis for its adverse decision. RBS refused to provide the report to Appellant. *(CR Vol. 1, Tab 2, Tab 6; CR Vols. 70-77)*

## DISCUSSION

*Legal Standards*

The rules at Title 7 of the Code of Federal Regulations (7 C.F.R.) Part 4279, Subparts A and B, and Part 4287, Subpart B govern the issues on appeal. Pursuant to those regulations, a lender is responsible for ascertaining all requirements for making, securing, servicing, and collecting a loan and ensuring compliance therewith. 7 C.F.R. § 4279.1(b). Lenders obtaining or requesting a B&I loan guarantee are responsible for: (i) processing applications for guaranteed loans; (ii) developing and maintaining adequately documented loan files; (iii) recommending only loan proposals that are eligible and financially feasible; (iv) obtaining valid evidence of debt and collateral in accordance with sound lending practices; (v) supervising construction; (vi) distributing loan funds; (vii) servicing guaranteed loans in a prudent manner, including liquidation if necessary; (viii) following Agency regulations; and (ix) obtaining Agency approvals or concurrence as required. 7 C.F.R. § 4279.30(a).

Loan guarantees provided by RBS are not enforceable to the extent a loss on a loan is occasioned by negligent servicing, use of funds for unauthorized or ineligible purposes, or failure to obtain required security. 7 C.F.R. §§ 4279.72(a) & 4287.107.

"Negligent servicing" is defined as the failure to perform those services that a reasonably prudent lender would perform in servicing its own portfolio of loans that are not guaranteed. 7 C.F.R. §§ 4287.102 and 4279.2. The term includes a failure to act, acting but not in a timely manner, or acting in a manner contrary to the manner in which a reasonably prudent lender would act. 7 C.F.R. § 4279.2.

The rules at 7 C.F.R. Part 11 govern the appeal. These rules provide, among other things, that no interested person shall make an ex parte communication relevant to the merits of an appeal to any NAD official. 7 C.F.R. § 11.7(b).

*1. Did RBS make an ex parte communication to a NAD official relevant to the merits of the appeal, and if so, is that cause for RBS's interest in the appeal to be denied, disregarded, or otherwise adversely affected?*

RBS made an ex parte communication to a NAD official relevant to the merits of the appeal; and that is cause for NAD to disregard all the information within the ex parte communication. Section 11.1 defines an ex parte communication as an oral or written communication to any officer or employee of NAD with respect to which reasonable prior notice to all parties is not given, but shall not include requests for status reports, or inquiries about NAD procedure. Section 11.7(b) prohibits any interested person from making an ex parte communication to any NAD official relevant to the merits of an appeal. RBS made an ex parte communication in violation of § 11.7(b).

The communication consisted of an OIG Report of Investigation (ROI) that one of RBS's representatives, an attorney with USDA's Office of General Counsel, submitted to NAD, on RBS's behalf, on June 30, 2005. Although RBS submitted the ROI to NAD, it refused to provide the same to Appellant. RBS provided Appellant a heavily redacted version of the ROI that, due to the redactions, differed from the ROI received by NAD. The ROI submitted to NAD was relevant to the merits of the appeal because RBS relied upon it as a basis for its adverse decision. By sending this evidence to NAD and withholding it from Appellant, RBS made a prohibited ex parte communication.

RBS made the prohibited ex parte communication after it received repeated notice not to do so. RBS first received notice of the prohibition on ex parte communication via a Notice of Appeal dated November 21, 2003. During the appeal hearing, the Hearing Officer again advised RBS's representatives not to submit evidence to NAD without submitting the same evidence to Appellant. RBS received further notice from NAD in the form of a NAD subpoena dated June 9, 2005, that directed RBS to provide the ROI in question directly to Appellant's counsel. After receiving repeated notice of the prohibition against ex parte communications, RBS knowingly made the above-referenced communication in violation of 7 C.F.R. §11.7(b).

Section 11.7(d) provides that upon receipt of an ex parte communication knowingly made by a party in violation of this section, the Hearing Officer or Director may, to the extent consistent

Enterprise National Bank
Case No. 2004S000154

with the interests of justice and the policy of the underlying program, require the party to show cause why such party's claim or interest in the appeal should not be dismissed, denied, disregarded, or otherwise be adversely affected on account of such violation. After receiving the ex parte communication from RBS, I afforded RBS an opportunity to make a copy of the communication available to Appellant's counsel. RBS refused to do so by an agreed-upon deadline. I then afforded RBS an opportunity to show cause why its interest in the appeal should not be dismissed, denied, disregarded, or otherwise adversely affected. RBS's attorney submitted a response that misstates facts and makes unsupported claims. RBS also argued that it would have provided the ROI to Appellant if NAD had agreed to the terms of a protective order that required NAD to restrict and police Appellant's use of the documents in perpetuity. However, the protective order was unenforceable, and it was irrelevant when it was proffered by RBS because, at that point, RBS had already released the ROI without a protective order via its ex parte communication to NAD. RBS has not shown cause why its interest in the appeal should not be adversely affected on account of the ex parte communication. Therefore, in accordance with § 11.7(d), I will disregard all the evidence that RBS submitted in its ex parte communication. (See CR Vols. 75-108 for the excluded ex parte communication and other evidence excluded due to irrelevance and unnecessary duplication.)

I further note that to comply with NAD's Hearing Guide, Section I, Paragraph III (D), I provided Appellant's counsel a copy of the ROI that I received from RBS. RBS argues that by giving the ROI to Appellant I cured its rule violation. I disagree. The belated submission of the ROI to NAD via an ex parte communication deprived Appellant of the timely receipt of a document that RBS should have provided as part of its Agency record. RBS should have provided the ROI with its Agency record because RBS admits it relied upon the ROI as a basis for its adverse decision; and the Agency record, by definition, includes all materials prepared or reviewed by the Agency during its consideration and decision-making process. 7 C.F.R. §11.1. RBS's initial deadline for providing Appellant its complete Agency record was December 1, 2003. By waiting approximately 18 months to submit the ROI to NAD, and by continuing to withhold it from Appellant, RBS deprived Appellant of the opportunity to fully address any allegations within the ROI. I find it inappropriate to reopen the record at this date to deal with the contents of RBS's improperly submitted evidence; and, thus, I will disregard that evidence. *(FOF 16)*

2. *Did the use of guaranteed loan funds for unauthorized purposes occasion a loss of $2,134,708?*

The use of guaranteed loan funds for unauthorized purposes did not occasion a loss of $2,134,708. Section 4279.72(a) provides that "any losses occasioned will be unenforceable to the extent that loan funds are used for purposes other than those specifically approved by the Agency in its Conditional Commitment." RBS's Conditional Commitment authorized the use of $280,000 in loan funds for working capital, $200,000 for fees and $4,520,000 for "building construction costs including site." As evidence of the unauthorized use of funds, RBS cites a lack of invoices to document construction costs, payment of a personal judgment, and other

Enterprise National Bank
Case No. 2004S000154

evidence concerning the amounts paid to the Contractor, subcontractor and third parties. This information, however, does not quantify the loss occasioned by the alleged misuse of funds.

To quantify the alleged loss occasioned by a misuse of funds, RBS analyzed appraisal data and evaluated the completed facilities, which serve to document the fact that loan funds were used for construction purposes. Based on its analysis, RBS attributed a loss of $1,062,053 to identifiable construction deficiencies, which I address in more detail below. The fact that RBS only detected $1,062,053 in identifiable losses related to construction deficiencies tends to refute its argument that a misuse of funds occasioned a loss of $2,134,708 on said facilities.

Even though RBS does not cite specific construction deficiencies that add up to a loss of $2,134,708, it contends the appraisal data supports its calculation that this sum was lost due to a misuse of funds. A preconstruction appraisal dated March 30, 1999, estimated that the "replacement cost new" of the proposed improvements was $4,403,130. A liquidation appraisal dated February 18, 2002, indicates the replacement cost of the completed improvements was $1,304,769. (CR Vol. 6, AR pages 1196, 1333) There is a $3,098,361 difference in these cost estimates. RBS attributes the difference to a diversion of construction funds; i.e., the borrower allegedly spent $3,098,361 less than originally planned on the facilities. However, even if RBS's reasoning was correct (and I do not agree that it is), the above amounts do not support its claim that an unauthorized use of funds occasioned a loss of $2,134,708. The above amounts imply a maximum loss of $3,098,361, of which RBS attributes a loss of $1,062,053 to specific construction deficiencies. Subtracting $1,062,053 from an alleged loss of $3,098,361 leaves a remaining loss of $2,036,308, not $2,134,708 as asserted by RBS.

Moreover, the appraisal data contradicts RBS's claim that the entire dollar-cost difference in the pre- and post-construction appraisals is attributable to a misuse of loan funds. The appraiser who completed the 2002 liquidation appraisal indicates that for various reasons, including market factors, the highest and best use of the facilities has changed from a catfish processing plant and daycare center to an industrial facility and office. Consequently, the appraiser did not base his 2002 cost estimate on the cost actually incurred in building the processing plant and daycare center. He based his estimates on the replacement cost of an industrial facility and office. He specified in his appraisal that his replacement cost does not reflect the cost of all the features that actually exist in the completed facilities. He did not include the cost of all the existing features because some of those features are not needed in an industrial facility and office. Thus, contrary to RBS's argument, the replacement cost cited in the 2002 appraisal does not reflect the amount of loan funds used to build the existing facilities. (CR Vol. 6, AR pages 1324-1328, 1335) RBS misconstrues the appraisal data by attributing the entire difference in the appraisals to a misuse of funds. RBS's determination that a misuse of loan funds occasioned a loss of $2,134,708 is erroneous because it is based on a misinterpretation of appraisal data and is inconsistent with said data. *(FOF 11-12)*

3. *Did construction deficiencies and negligence in construction oversight occasion a loss of $1,062,053?*

Construction deficiencies and negligence did not occasion a loss of $1,062,053. Section 4279.156(b) requires the lender to monitor the progress of construction, undertake the reviews and inspections necessary to ensure that construction complies with building codes, and ensure that proceeds are used according to approved plans, specifications, and contract documents. Sections 4279.72(a) and 4287.107 provide that a guarantee is unenforceable by the lender to the extent a loss is occasioned by negligent servicing. RBS contends Appellant was negligent in that it failed to ensure that construction proceeded according to the original plans. With respect to this issue, RBS alleges losses of: (a) $182,000 on a daycare center; (b) $500,000 on a waste separator; (c) $80,000 on a maintenance shed and guardhouse; and (d) an additional loss of $409,500 allegedly caused by Appellant's failure to ensure that its liquidation appraisal considered the value of a canopied loading area and other paved areas. These amounts total $1,171,500. From this total, RBS subtracted $109,447.20 in unused loan funds and arrived at a loss of $1,062,052.80 (rounded to $1,062,053). I address the alleged losses below.

(a) Daycare Center

RBS decided Appellant failed to ensure completion of the daycare center according to the size and quality standards set forth in the loan application and loan-processing appraisal. RBS contends this caused a loss of $182,000. RBS arrived at this amount by comparing the two appraisals referenced above. It compared the loan-processing appraisal dated March 30, 1999, and the liquidation appraisal dated February 18, 2002. The 1999 appraisal estimated that the proposed daycare center would cost $511,000. The 2002 appraisal indicates the existing daycare center, valued now as an office, has a replacement cost of $328,224. RBS contends the decline in replacement cost from $511,000 to $328,224 represents a value loss of $182,776, which RBS rounds to $182,000. RBS erred, however, in interpreting the appraisal data.

The 1999 and 2002 appraisals, upon which RBS based its decision, are so different in content and purpose that they do not support a conclusion that negligence occasioned a loss of $182,000 on the daycare center. One major difference in the two appraisals is that the 1999 appraisal reflects a cost of $511,000 for the daycare center and site work, whereas the 2002 cost of $328,224 does not include site work. This accounts for a substantial portion of the $182,000 difference in the two appraisals. While the 1999 appraisal provides a single cost of $511,000 for building and site improvements, the 2002 appraisal breaks these components apart. The 2002 appraisal reflects a cost of $328,224 for the daycare center plus an additional $224,063 for site improvements and $33,250 for paving. RBS failed to consider this point. (CR Vol. 6, AR pages 1196, 1333)

The site cost reflected in the 2002 appraisal includes the cost for all the site work on the project. This includes site work for the catfish processing plant and the daycare center. Thus,

only part of the $224,063 is associated with site work for the daycare center. Nonetheless, the 1999 and 2002 appraisals verify that the daycare center required site work. Accordingly, part of the $224,063 estimate for site work must be added to the $328,224 cost for the daycare center. RBS ignored this fact when it analyzed the dollar-cost differences in the appraisals. Consequently, RBS's analysis is incomplete; and its claim that the evidence reveals a loss of $182,000 loss on the daycare center is incorrect.

There is further evidence that RBS erred when it attributed a loss of $182,000 to the dollar-cost differences in the 1999 and 2002 appraisals. As noted above, the 1999 appraisal reflects the replacement cost of a daycare center, whereas the 2002 appraisal reflects the replacement cost of an office. This is relevant because, as the 2002 appraisal points out, there is "extra cost built into the daycare center beyond the normal preparation for quality office space." For example, the 2002 appraisal cites the fact that the daycare center has full kitchen facilities. Such facilities are not included in the replacement cost of an office. Thus, part of the dollar-cost differences between the 1999 and 2002 appraisals is attributable solely to a difference in appraisal methods rather than a failure to ensure that the daycare center was built according to plan. This refutes RBS's assertion that the entire dollar-cost difference is attributable to a failure to build the facilities as planned.

I further note that the 2002 appraisal values the daycare center as an office not because of deficiencies in the daycare center but because the highest and best use of the entire property, i.e., the processing plant and associated facilities, changed between 1999 and 2002. As stated above, the appraiser determined for various reasons that as of January 2002, the highest and best use of the catfish processing plant was as an industrial facility. He further decided that because the processing plant and daycare center are on the same property, there could be benefits in selling the entire site as a single property. Accordingly, he appraised the entire site as an industrial facility and treated the daycare center as an office associated with an industrial plant. (CR Vol. 6, page AR 1322, 1325) This indicates the change in highest and best use of the daycare center was not the result of deficiencies in the daycare center. The 2002 appraisal acknowledges that the daycare center can fulfill its intended purpose as a daycare center. The appraiser specified that the daycare center has minor flaws that can be remedied to ensure that it conforms to State rules for a daycare center. He also points out that the daycare center has an irregular shape, which requires extra staff to ensure that the children are observable at all times, but this does not prevent its operation as a daycare center. I note that in its briefs, RBS implies that if Appellant had ensured that its borrower made a required equity injection, which I discuss below, the daycare center and catfish processing plant would have functioned as planned with no changes in use and no losses. RBS, however, did not decide that the failure to inject equity occasioned the $182,000 loss on the daycare center; and I only address the decision actually made by RBS. I have no jurisdiction to address decisions RBS claims it could have made. For the above reasons, I conclude that contrary to RBS's claim, the alleged negligence and construction deficiencies did not occasion a loss of $182,000.

Enterprise National Bank
Case No. 2004S000154

### (b) Waste Separator

The original plans for the project required a waste separator with an estimated cost and value of $305,054. The borrower did not install the complete system as planned. RBS contends the failure to ensure the installation of the system occasioned a loss of $500,000. I disagree. The evidence does not support RBS's calculation that a failure to install a component worth $305,054 occasioned a loss of $500,000. Appellant has provided sufficient evidence to show that RBS erred on this point.

### (c) Maintenance Shed and Guardhouse

The plans for the project included a maintenance shed and guardhouse valued at $80,000. Appellant did not ensure that its borrower built these structures. RBS decided that the failure to build the structures occasioned an $80,000 loss in the value of the collateral. I agree. Appellant has not shown that the planned facilities exist, nor has Appellant refuted RBS's determination that the absence of the facilities occasioned a loss of $80,000.

### (d) Liquidation Value of Canopied Loading Area and Other Paved Areas

RBS disagrees with the liquidation appraisal that Appellant used to calculate its loss claim. The appraisal reflects a value of $940,000. RBS contends the value is too low because the liquidation appraisal fails to consider the cost of a loading area and other paved areas. RBS based its decision, in part, on information it received from an RD appraiser. (CR Vol. 6, page 1394) The RD appraiser estimated that the cost of existing paving is $280,000. The RD appraiser noted that Appellant's liquidation appraisal accounts for part ($33,250) of this cost. The RD appraiser did not provide a cost for the loading area, but RBS estimated the cost of the area to be $129,500.

RBS added the cost of the paving ($280,000) to the cost of the loading area ($129,500) and decided that the resulting sum of $409,500 represents the value of the areas in question. RBS decided that because the liquidation appraisal did not include these costs, it undervalued the property by $409,500 and caused Appellant to inflate its loss claim. RBS attributed a $409,500 loss in the liquidation value to Appellant's alleged failure to account for the value of subject areas. RBS erred on this point.

RBS erred because it misinterpreted the data it received from the RD appraiser. It is true that the RD appraiser estimated the cost of the pavement to be $280,000. However, the appraiser also acknowledged that Appellant's liquidation appraisal accounts for part of this cost. The liquidation appraisal clearly accounts for at least $33,250 of the cost in question. (CR Vol. 6, AR pages 1333, 1334, 1394) Thus, even if it were appropriate to adjust the liquidation value to account for the paving cost, it would only be appropriate to adjust the value by $246,750 ($280,000 less $33,250 already considered), not by $280,000 as claimed by RBS. Furthermore, even the sum of $246,750 is questionable because as noted above, the liquidation appraisal includes a cost of $224,063 for site work in addition to the $33,250

referenced by RD's appraiser. That cost of $224,063 may very well account for part of the paving in question. Even if this is not the case, RBS erred by ignoring the $33,250 cost already factored into the liquidation appraisal.

Moreover, the evidence shows that RBS's entire decision on this point is materially flawed because RBS inaccurately equated replacement cost to market value. This is relevant because the loss claim is based on market value, not replacement cost. Appraisals of the facilities show that replacement cost does not equate to market value for the existing facilities. The only appraisals that equate cost to market value are the preconstruction appraisals based on new or proposed construction. The existing facilities and site improvements are no longer new. They have aged and lost value due to normal physical depreciation. As such, their undepreciated replacement cost does not equate to market value.

The liquidation appraisal recognizes this fact and depreciates the replacement cost of the improvements, including the pavement, to account for physical depreciation. In addition, the liquidation appraisal depreciates the replacement cost by an additional $457,000 due to functional obsolescence, a second type of depreciation that the appraiser defines, in part, as any loss in value resulting from over or under-improvement. (CR Vol. 6, AR pages 1334, 1355) The information supplied by RD's appraiser does not dispute the fact that in order to determine market value, the "replacement cost new" of existing improvements must be depreciated for aging and possibly for changes in highest and best use and market conditions. RBS disregarded this fact and incorrectly assumed that the market value of the components equals their undepreciated "replacement cost new". RBS made multiple miscalculations with respect to the $409,500 in question. It ignored the fact that the liquation appraisal includes part, and possibly all, of the paving cost; and it ignored appraisal data that indicates replacement cost does not equate to market value.

In summary, RBS's calculation of losses associated with the daycare center, waste separator, loading area and other paved areas are materially flawed. Due to its miscalculations, RBS erred in deciding that negligence and construction deficiencies occasioned a loss of $1,062,053. *(FOF 10 -12)*

4. *Did Appellant fail to ensure that its borrower contributed $2,950,000 to the project to purchase equipment, and if so, did this occasion a loss of $2,950,000?*

Appellant failed to ensure that its borrower contributed $2,950,000 to the project, and this occasioned a loss of $2,950,000. Section 4792.72(a) provides that a loan guarantee is unenforceable to the extent a loss is occasioned by negligent servicing or failure to obtain required security. The loan proposal and Conditional Commitment for the guarantee required Mr. Rabhan to contribute $2,950,000 from personal funds to purchase equipment. The equipment was to secure the guaranteed loan. Appellant was responsible for ensuring that Mr. Rabhan contributed the $2,950,000 and acquired the required security. Appellant accepted affidavits from Mr. Rabhan and the Contractor claiming that the Contractor had received $2,950,000 and was holding said amount for the purchase of equipment. Appellant did not check the Contractor's bank records or perform other due diligence to ensure that he actually

possessed the funds. In reality, Mr. Rabhan never paid the Contractor $2,950,000 and the Contractor never delivered the equipment. Appellant's failure to perform appropriate due diligence to verify the existence of either the funds or the equipment created conditions that allowed the loan to proceed without the required equity injection and without collateral worth $2,950,000. ~~This occasioned a loss of $2,950,000.~~ *(FOF 7-9)*

5. *As RBS did not attribute a specific, unduplicated loss to its allegation that Appellant withheld information and misrepresented draw requests, is such allegation proper grounds for reducing Appellant's loss claim?*

RBS's allegation that Appellant withheld information and misrepresented draw requests is not grounds for reducing Appellant's loss claim. RBS may only reduce a loss claim to the extent a loss is occasioned by negligent servicing, use of funds for unauthorized or ineligible purposes, or failure to obtain required security. 7 C.F.R. §§ 4279.72(a) & 4287.107. RBS did not attribute a specific loss to this issue other than an alleged loss of $170,000 that resulted from the use of loan funds to pay a personal judgment. RBS included the loss of the $170,000 in above-referenced loss of $2,134,708 that RBS attributed to the use of funds for unauthorized purposes. RBS cannot cite the same loss as grounds for a second reduction in the loss claim. As RBS did not attribute a specific, unduplicated loss to this issue, the issue provides no basis for reducing Appellant's loss claim.

6. *Did RBS withhold adverse information from Appellant about the borrower of the loan in question and thereby cause the losses on said loan?*

RBS did not provide Appellant all the adverse information that certain RD employees possessed concerning Mr. Rabhan, but that did not cause the losses on the loan. RD employees possessed information about Mr. Rabhan's submission of fraudulent invoices in an effort to obtain a B&I loan in 1995. RBS did not divulge this information to Appellant even though it was the RBS Administrator's stated policy to disclose adverse information in RBS's Conditional Commitment for a loan guarantee. Notwithstanding RBS policy, I do not agree that nondisclosure of negative information about Mr. Rabhan caused the losses in question.

Appellant did not need to be forewarned about Mr. Rabhan in order to perform due diligence in verifying the information it received from Mr. Rabhan and his Contractor. Receiving such a warning is not a prerequisite to the performance of due diligence. This is proven by the actions taken by RD's Area Specialist in 1995. The Area Specialist had no forewarning about Mr. Rabhan. Yet, she performed appropriate due diligence when she received invoices purporting to show that Mr. Rabhan had prepaid $3,879,200 for equipment. Rather than accepting Mr. Rabhan's information at face value, she conducted an independent investigation to verify the information. She discovered that the invoices were false and thereby thwarted an apparent attempt to perpetrate fraud. Even though RBS did not forewarn Appellant about Mr. Rabhan in 1999, Appellant still had the same opportunities to verify the accuracy of Mr. Rabhan's information that RD's Area Specialist had in 1995. For this reason, I conclude that the failure to warn Appellant did not cause the losses in question. *(FOF 2, 7-9)*

Enterprise National Bank
Case No. 2004S000154

*Summary:*

RBS has repeatedly argued that the sole issue is negligence. That too is an error by RBS. Also at issue is the extent to which alleged negligence, or misuse of funds and failure to obtain required security, occasioned a loss. 7 C.F.R. § 4279.72(a). RBS attempted to calculate the extent to which these factors occasioned a loss, but its calculations are inaccurate due to misinterpretations of data and accumulated mathematical errors. RBS reduced Appellant's $3,160,075.50 loss claim to zero based on a calculation that the above factors occasioned the entire loss of $4,213,434. RBS's decision is erroneous because RBS has not correctly calculated the extent to which the alleged negligence and other factors occasioned a loss.

## DETERMINATION

Under 7 C.F.R. § 11.8(e), Appellant has the burden of proving the adverse decision is erroneous by a preponderance of the evidence. Appellant has proven that RBS's decision is erroneous.

This is a final determination of the Department of Agriculture unless a party to the appeal files a timely request for review.

Dated and mailed this 2nd day of December 2005

Charles R. Mills
Hearing Officer
National Appeals Division

Enterprise National Bank
Case No. 2004S000154

Attachments:
Notice of Right to Request Director Review
Request for Director Review

Distribution of copies:

APPELLANT
Enterprise National Bank
Attn. Mr. Randall A. Ezell, CEO
3980 RCA Boulevard, Suite 8012
Palm Beach Gardens, FL 33410

APPELLANT'S REPRESENTATIVES
Powell Goldstein LLP
Attn. Mr. John J. Richard, Esq.
One Atlantic Center, 14th Floor
1201 West Peachtree Street NW
Atlanta GA 30309-3488

Mr. Alan R. Simon, Esq.
Post Office Box 31041
Palm Beach Gardens, FL 33420

AGENCY'S REPRESENTATIVE
Mr. Mark L. Stevens, Esq.
USDA, Office of the General Counsel
1718 Peachtree Road Suite 576
Atlanta, GA 30309-2409

USDA, Rural Development
Attn: Ms. Karen L. Bryan
355 East Hancock Avenue, Stop 305
Athens, GA 30601

USDA Rural Business-Cooperative Service
Attn: Mr. David W. Lewis
Room 6861, South
1400 Independence Ave. SW
Washington DC 20250

Mr. F. Stone Workman, State Director
USDA, Rural Development
355 East Hancock Avenue, Stop 300
Athens, GA 30601

Enterprise National Bank
Case No. 2004S000154

USDA, Rural Development
State Appeals Coordinator
355 East Hancock Avenue, Stop 300
Athens, GA 30601

USDA Rural Business-Cooperative Service
Administrator
Stop 3201, Room 5801-S
1400 Independence Ave., SW
Washington, DC 20250-3201

Enterprise National Bank
Case No. 2004S000154

# NOTICE OF RIGHT TO REQUEST DIRECTOR REVIEW
## AND/OR COPY OF TAPE

**DIRECTOR REVIEW REQUEST**

Either party may request that the Director of the National Appeals Division review this determination. A suggested format is attached, but any request is acceptable if it has all the information in the "Instructions for Request for Review" listed below.

**An Appellant** who believes that this determination is wrong must file its request for Director review within 30 days of receipt of this determination. The Director presumes that it usually takes 7 days for a determination to reach an appellant by mail. However, the Director will accept requests filed more than 30 days from the date of the receipt of the determination if the person shows that receipt took longer than usual. A request must be in writing and be signed by Appellant. A request must also follow the "Instructions for Request for Review" listed below

**The Agency** may also file a request for Director review if it believes this determination is wrong. The Agency must file its request within 15 business days of receipt of this determination. The head of the Agency or someone acting in that capacity must sign the request. The Agency must also follow the "Instructions for Request for Review" listed below.

Parties may file written responses to a request for Director review within 5 business days of receipt of a copy of the request for review. Responses should be sent to the address listed below, and a copy of the response must be sent to the other party.

The date a document is considered "filed" is either the date it is delivered in writing to the NAD, or its postmark date, or the date that a complete facsimile copy is received by the NAD.

Enterprise National Bank
Case No. 2004S000154

## Instructions for Requests for Review

A request for review must—

1. be personally signed by Appellant and dated.
2. specifically request a review.
3. give the case number for the Hearing Officer determination. The case number is on the top right-hand side of the first page of the determination.
4. note the date the requester received the Hearing Officer determination.
5. say why the determination is wrong.
6. confirm that the requester has also sent a copy of the request and additional information, if any, to the other party at the same time that the request was sent to NAD.
7. be mailed, faxed or delivered by commercial delivery service to:

Mailing Address:   National Appeals Division
P. O. Box 1508
Cordova, Tennessee 38088

Physical Address:  National Appeals Division
7777 Walnut Grove Road, Suite A-5
Memphis, Tennessee 38120

Fax Number:     1-901-544-0363
Phone Number:   1-800-552-5377
TDD Number:     1-800-627-8332

NAD Website:  www.nad.usda.gov

## COPY OF TAPE REQUEST

Appellant(s) and Agency may obtain a copy of the audiotapes made of the prehearing/hearing proceeding(s) at no cost. Appellant(s) and/or Agency may obtain the copies by making a written request to the NAD Regional Office at the above address.

Enterprise National Bank
Case No. 2004S000154

### REQUEST FOR DIRECTOR REVIEW

I/We, (print name(s)) _____ am/are the appellant(s)/agency head in the above-referenced appeal and I/we request a Director review of the appeal determination. The case number is _____.

The appeal determination was received on _____.

The specific reasons why I/we believe the appeal determination is wrong are: (You may attach additional sheets and documents, if desired.)




A copy of this request and any attachments was mailed to the other parties on _____.

I/We swear that all statements in this filing are true to the best of my/our knowledge and belief.


_____    _____
(Appellant(s)/Agency head signature)