UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENTERPRISE NATIONAL BANK,<br><br>        Plaintiff,<br><br>v.<br><br>MIKE JOHANNS, Secretary,<br>U.S. Department of Agriculture,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 06-1344 (RCL)<br>)<br>)<br>)<br>) |

### PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO
### DEFENDANT'S MOTION FOR DECLARATORY JUDGMENT

Plaintiff Enterprise National Bank ("Enterprise" or the "Bank") hereby submits its Response Brief in Opposition to the Defendant U.S. Department of Agriculture's (the "Agency") April 5, 2007 Motion for Declaratory Judgment (the "Motion").

In its Motion, the Agency asserts that it correctly applied the Hearing Officer's Remand Determination when it refused to honor its full faith and credit loan guarantee to the Bank following a final agency decision in the Bank's favor. However, the Remand Determination's operative section states unequivocally that the Bank had met its burden of proof in showing that the Agency's action in dishonoring the guarantee was erroneous. (CR 13564). No further reduction or refusal to honor the guarantee was warranted or permitted.

Rather than focusing substantively on whether the Agency has correctly interpreted the Remand Determination, the Agency has incorrectly framed the issue to be decided by asking this Court to declare that the Agency's underlying decision to dishonor its guarantee was correct. As an enforcement action under the Administrative Procedure Act ("APA"), this Court's focus should be directed to the Remand Determination and the Agency's compliance with it, not with

the underlying basis for the Agency's decision which has now been litigated through two complete evidentiary hearings and one appeal to the NAD Director.

The Agency asserts that the evidence found within the administrative record supports its decision. As the Bank argued successfully in the remand proceedings, the evidence actually supports a ruling that the Agency's decision to dishonor its guarantee was erroneous.

The Agency now focuses on two points litigated extensively before the National Appeals Division. The first is whether the Bank's decision not to insist upon construction of a maintenance building and guard house on the borrower's property occasioned a loss of collateral – and a corresponding loss of loan funds – in the amount of $80,000.00. (Motion at 11-13). The second point is whether the Bank's alleged failure to secure delivery of processing equipment occasioned a loss of collateral – and a corresponding loss of loan funds – in the amount of $2,950,000.00. (Motion at 13-15).

I.     **The decision not to insist upon construction of extraneous buildings did not cause any loss.**

The first issue is easily resolved. The Bank decided not to insist upon construction of the maintenance building and guard house because these structures were not called for in the operative construction plans. As shown during the hearings, there can be no loss associated with the absence of these structures because no loan funds were ever disbursed for their construction. (CR 21765-21770). There was no need to collateralize loan funds still in the Bank's coffers and there can be no loss of loan funds which were never disbursed.

Furthermore, the evidence shows that the value of the property is not diminished by the absence of these structures because potential post-foreclosure buyers expressed no interest in having such structures on the property. (CR 21767-68). Contrary to the Agency's unsupported assertions, $80,000 is not even a reasonable cost for such structures. As set forth in

2

supplemental correspondence from the appraiser, a reasonable cost for the maintenance building and guard house was in the range of $35,000.00 to $50,000.00, not the $80,000.00 attributed by the Agency. (CR 9827-28; CR 21768-70). The evidence does not support the Agency's attempt to further reduce and dishonor its loan guarantee following the issuance of the Remand Determination in the Bank's favor.

II. **The non-discovery of the borrower's independent fraud does not equal negligence and does not support a reduction in the loan guarantee.**

The second and more complex basis for the Agency's improper decision to reduce the loan guarantee focuses on the borrower's fraudulent statements to the Bank and the Agency concerning the provisioning of the manufacturing plant at issue with $2,950,000.00 worth of equipment it needed to function properly. The Agency contends that the performance bond process it approved for use by the Bank in this situation was insufficient and that the Bank was negligent in not discovering the borrower's acts of fraud against the Bank and the Agency.

The extensive evidence contained within the certified record shows that the Agency's loss was caused not by any negligence by the Bank, but by the Agency's failure to disclose the borrower's prior attempts to defraud the Agency and an unrelated bank using an almost identical scheme just a few short years before. As the Bank's witnesses testified repeatedly during the hearings, Enterprise National Bank never would have made the loan at issue had it known of the borrower's prior fraudulent activity.

With respect to the $2,950,000 collateral issue, the Agency alleges that the Bank was negligent because it did not obtain the collateral as required by the conditional commitment and loan agreement and because it did not independently confirm that the required equity injection of $2.95 million actually existed.

3

In other words, the equity injection was to be used to purchase the equipment to be collateral. Equity was to be used to purchase equipment. If the equipment had in fact been purchased and installed, then the equity investment would have been made and the collateral would have existed.

The equipment was to be delivered and installed by a third-party, Mr. Lee Jones, through his company, LNJ & Associates ("LNJ"). LNJ was the general contractor on the project for the supply of the equipment. LNJ and the borrower, Catfish INT Inc., Mr. Erwin Rabhan's company, were two of the parties to the construction contract. As shown during the hearings, Mr. Rabhan and Mr. Jones told the Bank and the Agency that the equipment could not be delivered and installed until the construction of the building was completed. As the transaction developed, Mr. Rabhan would prepay for the equipment, constituting his equity injection, and the Bank and the Agency would receive evidence that the equipment had been paid for and would be delivered and installed. The Bank and the Agency both accepted that arrangement and acknowledged their acceptance at the time of loan closing and issuance of the guarantee.

By the time the loan closed, in July 1999, the $2.95 million had supposedly been paid to LNJ as a third-party contractor who would install the equipment. LNJ was carrying a credit to Catfish INT, Inc. In fact, the money had not been paid and neither the equipment nor the credit existed. Both the Bank and the Agency agree that they now know the equity injection was not made, and that the $2.95 million in collateral in the form of processing equipment did not exist. This was the heart of the fraud committed by Mr. Rabhan and his associates, including Mr. Jones. Both men are serving federal prison sentences for precisely this fraud.

The question is whether the lack of collateral, the absence of the equity injection, and the breach by the borrower is a basis for the Agency to dishonor its guarantee to the Bank. The

Bank contends that the Agency's focus on these issues is fundamentally in error and misinterprets both the law and the evidence.

The misunderstanding on these issues centers on the roles played by all concerned in obtaining the equipment and other collateral. The Agency takes the overly simplistic approach of equating a lack of collateral for any reason, with negligence by the Bank leading directly to the Agency's loss. Not only does the evidence prove that the Bank acted as a prudent lender and that it was far from negligent, but the evidence also shows that the Agency's loss was caused by the criminal acts of the borrower's principal and the general contractor. Rather than being a tie to the Bank's alleged liability, the criminal acts of third parties are a legal defense to a negligence claim. Finally, the Agency's regulations require only that the Bank act as a prudent lender under the circumstances. The overwhelming evidence on these issues shows that the Bank went well beyond acting as a mere prudent lender and the Bank should not be faulted for not discovering a scheme known to and concealed by the Agency for years.

It is important to remember the framework involved here. The agency has issued a loan note guarantee and that guarantee is supposedly backed by the full faith and credit of the United States. The Agency has undertaken to repay the lender if the borrower does not pay. The borrower's non-performance, alone, is not a reason for the Agency to dishonor its guarantee – the whole point of a guarantee is to cover the recipient's risk of the borrower's non-performance. The question below was whether the Bank acted in accordance with its statutory and program obligations in believing, in good faith, that the investment had been made and the collateral existed.

While the Agency is in effect applying a strict liability standard against the Bank, alleging that since there is a loss, the Bank must be the cause, it is critical to consider the exact

5

nature of the Bank's obligations. Under 7 C.F.R. § 4279.30(a)(i)(iv), lenders are responsible for "obtaining valid evidence of debt and collateral in accordance with sound lending practices." Under 7 C.F.R. § 4279.30(a)(1)(vii) the lender is responsible for "servicing guaranteed loans in a prudent manner."

Also, under 7 C.F.R. § 4279.131 "the lender is primarily responsible for determining credit quality and must address all of the elements of credit quality in a written credit analysis including adequacy of equity, cash flow, collateral history, management, and the current status of the industry . . ." Finally, under 7 C.F.R. § 4279.131(b)(1) "Collateral must have documented value sufficient to protect the interests of the lender and the Agency . . ."

Thus the pertinent questions as to this issue are:

1. Did the Bank comply with "sound lending practices" in accepting the evidence offered of collateral;

2. Did the Bank address all elements of credit in a written credit evaluation;

3. Did it act in a prudent manner; and,

4. Was there sufficient documented value of collateral?[1]

The Bank presented testimony during the hearings regarding how this collateral transaction developed and evolved. The evidence showed that the original conditional commitment was modified with respect to the equity injection and that, in modification number four, the Agency acknowledged and approved of the Bank's methodology for documenting collateral and providing additional protection to the Bank and the Agency through the use of supply and performance bonds. By the time of loan closing, the Agency had accepted the

---

[1] Per 7 C.F.R. § 4279.2, Negligent servicing is "The failure to perform those services which a reasonably prudent lender would perform in servicing (including the liquidation of) its own portfolio of loans that are not guaranteed. The term includes not only the concept of a failure to act, but also not acting in a timely manner, or acting in a manner contrary to the manner in which a reasonably prudent lender would act."

proposed arrangement, by which the equity injection would be derived from credits, and the Bank would provide the Agency with sworn affidavits from Mr. Rabhan and Mr. Jones, the construction contract, the bonds, and the loan agreements.

The evidence presented during the hearing shows that the Agency was in possession of these documents at the time it issued the loan note guarantee. The Bank provided these executed documents prior to the Agency's issuance of the guarantee. The Agency never raised any objection to proceeding with the loan collateral issues in this manner. Furthermore, the evidence showed that at the time the loan closed, the Bank believed, in good faith, that the equity injection had been made and that LNJ was carrying a credit for $2.95 million to Mr. Rabhan's contract.

The Agency alleges that the Bank relied on only two letters to verify the existence of the collateral at issue. The Bank presented substantial evidence during the hearing that it relied on much more than just the two letters cited by the Agency as evidence of the existence, ownership, and value of the equipment collateral.

That evidence includes:

1. Exhibit G18, page 1, an August 28, 1998 letter from Mr. Jones to Mr. Rabhan confirming the purchase order for the equipment and reciting that no refund of the prepayment will be available (CR 7892-7900);

2. Exhibit G18, page 2, an August 25, 1998 letter from DMT Industrial Contractors to Mr. Rabhan, reciting the issuance of the purchase order and payment; Id.

3. Exhibit Q9, a February 9, 1998 letter from Mr. Jones to Keith Walker and David Friedman, equipment suppliers, stating that LNJ would buy back the Catfish INT Inc. equipment if necessary and noting, "We feel so strongly about David's success that we are offering this for him." (CR 17482);

7

4.  Exhibit S20, an agreement and consent of the contractor to the assignment. Beginning on page 5 we find the contract between LNJ and Catfish INT Inc., which provides, among other things, for the delivery and installation of the equipment. (CR 8123-26). Page 13 of Exhibit 20 is the addendum to contract which recites the prepayment. Pages 15-16 consist of the itemized list of the equipment. In Exhibit S20 we find the consent to the assignment by LNJ of rights under contract. Catfish INT Inc. assigned its rights under the contract to the Bank. Catfish INT Inc. had an enforceable right to the delivery and installation of equipment valued at $2.95 million, which had supposedly already been paid for. Following execution of this agreement, the Bank was the assignee of that legally enforceable right; and,

5.  The Security Agreement, the UCC filings, and the supply and performance bonds discussed below and the due diligence signified by their issuance.

The final Loan Agreement (CR 195-233) defines "equity injection" as "the portion of the Borrower's capital equal to not less than U.S. $2,950,000.00, which amount has been prepaid to the General Contractor for the purchase, delivery and installation of the Plant Equipment pursuant to the Construction Contract." (CR 196). The general contractor is defined in the agreement as LNJ & Associates. (CR 197).

The Loan Agreement contains a condition that the lender has received "such evidence and proof as Lender may require that the Equity Injection has been made." (CR 204). The Bank received such evidence and that the Agency was provided with a copy of this final loan agreement before it issued the guarantee.

The Bank's evidence concerning the fact that the equity injection had been made included:

1. The affidavit of Mr. Jones regarding the prepayment found at Exhibit U20;[2]

2. The affidavit of Mr. Rabhan found at Exhibit S71;

3. The Security Agreement, Exhibit K20, which pledges all of the equipment as collateral and includes an equipment list that totals $2.95 million (CR 8065-8082);

4. The UCC filings; and,

5. The assignment of rights under the LNJ-Catfish INT Inc. contract.

At the time the loan was closed and the guarantee was issued, the Bank believed, consistent with all of its contractual and regulatory obligations, that it had valid evidence of collateral in accordance with sound lending practices.

To review, that evidence included, the 1998 correspondence regarding the equipment, the construction contract between LNJ and Catfish INT Inc. which recited the existence and value of the equipment, the assignment of the construction contract to the Bank, the affidavits of Mr. Rabhan and Mr. Jones, the security agreement with the accompanying list of equipment, and the existence of the supply and performance bonds signifying that additional due diligence had been conducted prior to their issuance.

The Agency has repeatedly returned to what the Bank knew of Mr. Rabhan's character during the origination of the loan to Catfish INT Inc. The Bank presented evidence during the hearings that the Bank had substantial and credible evidence on which to base its determination of Mr. Rabhan's character. As the Bank has since learned, the Agency had additional evidence of Mr. Rabhan's prior activities that would have led the Bank to a different determination but

---

[2] In preparing this response brief, undersigned counsel discovered a number of discrepancies within the certified record provided by the National Appeals Division. It appears that not all of the documents introduced in the NAD evidentiary hearings below have been included within the certified record on appeal. Counsel for the respective parties have conferred regarding this issue and are currently attempting to discover the scope of the issue and to develop a suitable solution. Undersigned counsel anticipates that the record will be supplemented with the mistakenly omitted documents. A that time, citations will be provided for all exhibits referred to without corresponding references to the certified record.

that the Agency did not share that information with the Bank. It is important to consider exactly what the Bank knew concerning Mr. Rabhan's character at the time the loan was closed and guarantee issued.

Exhibit H9 consists of a package of information the Bank received about Mr. Rabhan early in the loan process. The package and other information received contains numerous letters of reference, including Exhibits H9, pages 7 B 8 and K9 through P9. Of note are Exhibits Z9, pages 1-2 and A10, page 2 of 2, which are letters of introduction and reference from Mr. Rabhan's longtime friend, former President Jimmy Carter.

The Bank presented testimony during the hearings that the Bank had and considered these letters and other information before it closed the loan to Mr. Rabhan's company. Furthermore, the Bank had met with Mr. Rabhan and otherwise evaluated his character and financial status. These documents, and the other information the Bank had about Mr. Rabhan at the time the loan was closed and the time the guarantee was issued, support a judgment that his character was sufficient for lending purposes, given sound lending practices. Nothing in these documents or the other information available to the Bank suggested that Mr. Rabhan or his associates had been involved in earlier schemes to obtain guaranteed financing through submission of false invoices, reports, or affidavits. Bank vice-president Penny Rodgers and senior vice-president Mike Bollinger testified repeatedly that the Bank never would have made the loan to Mr. Rabhan's company had the Bank known the information in the Agency's files. None of the information the Bank possessed at the time the loan was closed suggested that Mr. Rabhan was anything other than a successful businessman with strong recommendations and credentials.

The affidavits and other evidence discussed above were not all the Bank had to ensure the existence and value of the collateral. The Bank received two bonds, a supply and performance bond, to ensure delivery and performance. It is important to understand how the bonds fit into the transaction and provided additional security. As an integral part of the bonding process, the Bank reasonably expected the bonding companies to perform the due diligence to ensure existence and delivery of the equipment. It was the bonding companies' legal responsibility and obligation to perform that due diligence. Mr. Bollinger testified that the use of construction supply and performance bonds is consistent with industry standards and sound lending practices.

The Agency alleged that the Bank withheld knowledge of insufficient collateral or made the loan with knowledge that the collateral was insufficient. The Bank presented testimony during the hearings regarding the Bank's motivations and mindset while originating and servicing the loan to Catfish INT Inc. The Bank's unguaranteed portion of this loan totaled $1.25 million, a substantial amount for a bank of Enterprise's size and capital structure. The Bank knew that the $1.25 million was not guaranteed and that if the loan failed the Bank would not be able to recoup that amount from anyone short of the recalcitrant borrower and other guarantors. The Bank was aware that if it did not meet program requirements it could imperil the benefit of the guarantee for the Bank.

Bank vice-president Penny Rodgers and senior vice president Mike Bollinger testified regarding their experience in working through issues of collateral valuation in the process of originating construction loans. They testified that they remained mindful of the obligations of the Bank under the conditional commitment and USDA B&I program regulations throughout this process. The testimony and evidence presented shows that the Bank complied with the obligations under the conditional commitment and USDA B&I program regulations.

As of October 1999, when the guarantee was issued, the Agency was aware of what information and documents were being relied on as to the existence of the equity injection and the value of the collateral. It is the Agency that has the ultimate obligation to protect the interests of the U.S. government when issuing guarantees. The B&I program regulations at 7 C.F.R. § 4279.186(b), require that the Agency be "<u>satisfied</u>" that all conditions for the guarantee have been met <u>before</u> issuing a guarantee:

> When the Agency is satisfied that all conditions for the guarantee have been met, the Loan Note Guarantee . . . will be issued.

The guarantee was issued in October 1999, three months after the closing of the loan. The Agency had three months to determine whether it was "satisfied" and to refuse to issue the guarantee under 7 C.F.R. § 4279.187 if it was not satisfied with the evidence presented.[3] The Agency raised no objections and voiced no concerns before obligating the full faith and credit of the United States with its guarantee. In summary, the evidence shows that the Bank complied with its contractual and regulatory obligations to the Agency and that the Agency's decision to further reduce its full faith and credit loan guarantee to the Bank is erroneous and unsupportable.

## CONCLUSION

The Bank respectfully requests that this Court deny the Agency's Motion for Declaratory Judgment and find that the Agency's attempt to further reduce and dishonor its loan guarantee to the Bank is in error.

---

[3] 7 C.F.R. § 4279.187: "If the Agency <u>determines</u> that it cannot execute the Loan Note Guarantee, the Agency will promptly inform the lender of the reasons and give the lender a reasonable period within which to satisfy the objections . . ." (emphasis added).

Respectfully submitted, this 14th day of May, 2007.

_____
JOHN J. RICHARD
D.C. Bar No. 480212
JOHN M. GROSS
Georgia Bar No. 313520 (admitted *pro hac vice*)

TAYLOR, BUSCH, SLIPAKOFF & DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
(770) 434-6868 – Telephone
(770) 434-7376 – Facsimile

                        Attorneys for Plaintiff
                        Enterprise National Bank

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENTERPRISE NATIONAL BANK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 06-1344 (RCL) |
| MIKE JOHANNS, Secretary, | ) |
| U.S. Department of Agriculture, | ) |
| | ) |
| Defendant. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Heather Graham-Oliver, Esq.
Assistant United States Attorney
Judiciary Center Building
555 4th Street, NW - Civil Division
Rm. 4-4808
Washington, D.C.  20530

This 14th day of May, 2007.

John J. Richard
D.C. Bar No. 480212