IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ENTERPRISE NATIONAL BANK,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. 06-1344 (RCL) |
| | * | |
| **MIKE JOHANNS, SECRETARY,** | * | |
| **UNITED STATES DEPARTMENT** | * | |
| **OF AGRICULTURE,** | * | |
| | * | |
| Defendant. | * | |

**REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR DECLARATORY JUDGMENT**

NOW COMES THE DEFENDANT, THE UNITED STATES OF AMERICA, acting on behalf of the United States Department of Agriculture (USDA), Rural Development (RD), Rural Business - Cooperative Service (RBS) (collectively known as the Agency), through the United States Attorney for the District of Columbia, and hereby files this Reply with Memorandum of Law, in support of its position that this Defendant must prevail on all counts involving all of the issues in this action.

**INTRODUCTION**

This action is brought under Chapter 7 of Title 5, which is commonly referred to as the Administrative Procedure Act (APA). See 5 U.S.C. §§ 701-706. This action is NOT a de novo proceeding but rather a review of the United States Department of Agriculture's (USDA) National Appeals Division (NAD), Hearing Officer's decision. Accordingly, this Court may not set aside the determination of the NAD Hearing officer unless the decision is arbitrary, capricious, an abuse of discretion, or otherwise unsupported by substantial evidence. 5 U.S.C. §

706(2)(A) and (E).

The arbitrary and capricious standard presumes the agency action to be valid and the burden is on the plaintiff to overcome that presumption. <u>Maryland Nat. Capital Park & Planning Comm'n v. Lynn</u>, 514 F.2d 829, 834 (D.C. Cir. 1975). "Substantial evidence" in the APA means more than a mere scintilla but less than the weight of the evidence and refers to relevant evidence which reasonably supports a conclusion. If the evidence can reasonably support affirming the Agency's decision, a court may not substitute its judgment for that of the agency. <u>Beard v. Glickman</u>, 189 F.Supp. 2d 994, 998 (C.D. Ca. 2001).

In the instant matter, the NAD Hearing officer's decision was supported by the evidence and may not be construed as arbitrary or capricious.

## ARGUMENT

**I.  The Evidence Supports The Conclusion That The Lender's Actions/Non-Actions Directly Caused the $2,950,000 Loss In Collateral and Equity Injection.**

    **A.  The Failure to Disclose The Entire Risk Of Loss to Agency**

The evidence clearly demonstrates that the lender did not act prudently with respect to the $2,950,000 loss in collateral and equity injection.[1] The Plaintiff/ Lender withheld from the Agency negative information that was supplied to the Lender by its legal counsel, Kilpatrick Stockton LLP, regarding: (a) the failure to secure machinery and equipment prior to loan closing

---

[1] The Hearing Officer determined that the Lender failed to ensure that the borrower contributed the required $2,950,000 into the project to purchase equipment. The Hearing officer also found that Lender's negligence in verifying the existence of this equipment and in allowing the loan to proceed without this needed equity injection occasioned a loss of $2,950,000. See Exhibit 1.

and (b) the protection provided by a surety bond that would have definitely changed the Agency's decision in concurring with such modification (AR 13125-13128, 306, 336-337, 356-359, 390-391, 397-398, 400-401, and 404-405).  Three months prior to the Lender closing the loan, on April 15, 1999, the Lender's attorneys acknowledged that "[b]ecause the purchase of the equipment by the borrower is intended to satisfy the "equity injection" requirement under the Loan Agreement and the equipment is to secure the loan, confirmation of the lien free purchase and delivery of the equipment is an important aspect of this transaction." (AR 336-337).  The Lender's attorneys warned the Lender in plain language ". . . that failure to require the purchase and lien free delivery of the equipment prior to funding the loan would significantly weaken the Bank's position. . ." and "[u]nless and until the borrower completes the purchase and obtains title to the equipment, the bank cannot have a perfected security interest in the equipment."  The Lender failed to inform the Agency of these legal opinions which foretold the dismal outcome of this case - no machinery and equipment, no lien, no recovery.

After failure of the project, another attorney for the Lender stated ". . . the bond was worthless the day it was purchased." (AR 744).  This evidence was before the hearing officer and revealed that there was considerable concern about the equity injection prior to the closing of the loan such that a prudent lender would never have closed the loan because of the significant risk for loss.

In fact, the Lender filed Case Number CV301-046 against Mountbatten Surety Co., Inc. in anticipation of collecting on the surety bond.  The Judge in that case determined that "[d]espite never receiving reliable proof that Rabhan had made a capital injection into the project, Enterprise loaned Rabhan and Catfish $5 million to build the facility, as evidenced by a

loan agreement dated July 19, 1999." ( AR 13691)  On December 20, 2004, the Judge ordered "that the Defendant Mountbatten Surety's motion for Summary Judgment is granted.  The Clerk is directed to enter judgment in favor of Defendant Mountbatten against Plaintiff Enterprise National Bank and Joinder Plaintiff, Catfish INT., Inc." ( AR13703-13704)  This outcome validates the lender's attorney's negative opinion as of July 16, 1999, three days prior to loan closure, that stated ". . . the issuance of the supply bond will add practically no value to the transaction."  (Ar 393)

The Lender made the decision to close the loan with full knowledge of the legal opinions.  The Lender documented in a memorandum to the file dated July 17, 1999 ( AR 404-405) that it was its ". . . business decision to close this loan without full agreement by legal counsel. . ."  It made the decision without Agency knowledge.  The Agency requires the Lender to act in a prudent manner.  But the evidence showed that the lender disregarded its own legal counsel's opinions regarding the transaction and as a result occasioned the $2,950,000 loss.

### B.    Lack Of Compliance With Loan Documents

The Lender lacked any due diligence in requiring compliance with the contractual documents.   The Agency detailed before the Hearing Officer, the Lender/Borrower's non-compliance with the loan agreement and construction documents (AR13041-13096).  For example, the evidence showed that the Lender did not require the Borrower to identify where the equipment was located prior to closing as required by the Addendum to the Construction Contract dated July 6, 1999 ( AR1436).[2]  The Agency received the Addendum No. 1 to the Construction Contract which stated that the Bank would ensure that the machinery and

---

[2] The actual loan closing date was July 19, 1999.

equipment " shall be delivered to and suitably stored at a location for subsequent incorporation in the completed construction." The evidence showed that this was never done. The Hearing Officer apparently discounted any undocumented assertion that the Agency agreed to allow noncompliance with this Addendum and agreed to wait until construction was completed for delivery of the machinery and equipment. (AR 1417). If the Lender had required deliverance of the equipment to a known location as required by the Addendum, Mr. Rabhan's fraudulent scheme would have failed.

The evidence showed that the engineering inspection firm alerted the Lender about the lack of information supplied on the processing equipment regarding its cost estimate (AR 10416). The engineering firm stated that . . . "[t]he greatest area of uncertainty in our cost estimate is that of the Processing Equipment. . . we have no information concerning the specifications of the equipment and what is included as part of each machine identified." Id. The evidence also showed that the Lender's attorneys were concerned and the engineering inspection firm was concerned regarding the equipment, yet the Lender lacked prudent lending practices in failing to ensure that those professional service providers' concerns were addressed.

The failure of the project is directly related to the Lender's lack of due diligence in ensuring compliance with covenants that were extremely important for a start-up construction project. Therefore, since the Lender controlled the loan disbursements and could have stopped the project at any point based on all the documented concerns, its lack of due diligence occasioned the loss, especially as related to the $2,950,000 machinery and equipment.

### C. The Failure To Validate The Existence Of The $2,950,000 Or The Ability to Obtain that Resource For the Project.

The Lender relied on certain documentation of the Borrower and the Contractor to argue that it was acting with due diligence. But the Hearing Officer was not persuaded by the argument. Clearly, the Lender's evidence concerning equity injection, i.e., the affidavit of Mr. Jones; the affidavit of Mr. Rabhan; the security agreement; the UCC filings and the assignment of rights under the LNJ-Catfish INT Inc., contract, failed to identify any due diligence of the Bank to ensure funds were set aside to purchase $2,950,000 in machinery and equipment. It certainly did not convince the Hearing Officer. See Plf's Opp., at p. 9. LNJ & Associates, Lee Jones, who was to provide the machinery and equipment, stated in a deposition that the Lender never asked the right question, it never asked .... "[w]ell, where is this Two Million Nine Hundred and Fifty Thousand Dollars, Mr. Jones? They never asked that question. . . .The second thing is that I said, well, they'll check my finances, and they'll know old Lee Jones ain't never had Two point Nine-five Million dollars in his life. . . .So I'm thinking there's no way that, after they do a little due diligence, that they're going to - they're going to open a loan to Rahban. . . . (AR 13612).

The evidence showed that the Lender failed to act in a prudent manner and therefore, the Hearing Officer's Determination should be upheld.

### D. Failure To Confirm The Equipment

Although the Lender relied upon an August 28, 1998 letter confirming receipt of the purchase order for the equipment, (AR 7892) the evidence as admitted showed that this letter had no itemized list of machinery and equipment totaling $2,950,000, and furthermore that the amount in the purchase order ($1,260,000) was different from the required ($2,950,000) value of the machinery and equipment. In addition, an August 25, 1998 letter also indicated a $1,260,000

6

deposit on equipment. (AR 7893) This was a substantial difference from the agreed upon value of the equipment and yet there was no evidence that the Lender did anything to ensure that the appropriate funds were being held to purchase the machinery and equipment. This is so, even though these letters are dated 11-18 months prior to the actual loan closing of July 19, 1999.[3]

Moreover, the Agency asked the Lender where the equipment was to no avail. (AR 500, 507, 517). There was no evidence that the Lender did any due diligence to make sure that the equipment existed. The Lender's attorney summed the situation up quite appropriately when he stated that "the equipment does not exist and never did." (AR 714).

## II. The Evidence Supports The Conclusion That The Lender Failed To Ensure The Construction Of The Maintenance Building And Guard House.

The evidence before the Hearing Officer was that once the Lender certified that all planned property acquisition has been or will be completed, it was required to follow through the development as planned. (AR 185). The Agency approved no change orders to the construction of the facilities. The Lender submitted an appraisal report that initially reflected a value of $7,400,000. In that valuation, a guardhouse and maintenance building was cited with a value of $80,000.00 (AR 1216).[4] Hence, the collateralization of the loan was based on the appraisal report

---

[3] Again, in May 1999 the Lender received two letters identifying a total purchase of $2,498,600 (not the required $2,950,000 value) without any itemization of the machinery and equipment that would be delivered (AR 348-349).

[4] To further support that the multiple facilities were planned, the record identifies where Lockwood Greene (Lockwood Greene) Engineers, Inc., the lender's contracted inspection company, states in a letter to the lender that "[n]o plans or specifications were received or estimated for a maintenance facility even though it is mentioned in the contract." (AR 374) Lockwood Greene also estimated the value of the Maintenance Building at approximately $30-40 per square foot. "This would put the Maintenance Building value at around $84,000-112,000."

submitted by the Lender. There was never any evidence that these buildings were constructed. Accordingly, the Hearing Officer's determination that the Lender was negligent in ensuring that the collateral, i.e., the guardhouse and maintenance building, was obtained should be upheld.

                                    Respectfully submitted,

                                    /s/
                                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                                    United States Attorney

                                    /s/
                                    RUDOLPH CONTRERAS, D.C. BAR # 434122
                                    Assistant United States Attorney

                                    /s/
                                    HEATHER GRAHAM-OLIVER
                                    Assistant United States Attorney
                                    Judiciary Center Building
                                    555 4th Street, NW - Civil Division
                                    Rm. 4-4808
                                    Washington, D.C. 20530
                                    (202) 305-1334

                                    Attorneys for Defendant